**DOUDS v. CONFECTIONERY AND TOBACCO JOBBERS EMPLOYEES UNION LOCAL 1175, RETAIL CLERKS INTERNATIONAL ASS'N, A.F.L.**

United States District Court
S. D. New York.

May 25, 1949.

Robert N. Denham, General Counsel, David P. Findling, Associate General Counsel, Winthrop A. Johns, Assistant General Counsel, Washington, D. C., James V. Altieri, John J. Cuneo, New York City, for petitioner.

Louis P. Goldberg, New York City, for respondent.

HULBERT, District Judge.

Petitioner, on behalf of the National Labor Relations Board (hereinafter called the Board), seeks injunctive relief pursuant to section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(*l*), pending the final adjudication of the charges filed with the Board against the respondent union. The charges allege that respondent, Local 1175, has engaged in, and is engaging in, conduct in violation of section 8(b)(4)(A) of the Act, 29 U.S. C.A. § 158(b)(4)(a), by conducting a so-called secondary boycott. The petitioner, after investigating the charges, states that he believes them to be true and that "a complaint of the Board, based thereon, should issue against the respondent, pursuant to Section 10(b) of the Act."

The facts that form the basis for the charge, as set forth in the petition and supporting affidavits, are for the most part admitted by respondent in its answer. The legal conclusion to be drawn from the facts, namely, whether there is reasonable cause to believe that the union has engaged in a secondary boycott, is keenly contested.

As a prerequisite to the granting of injunctive relief sought by the Board, the Court must find that there is reasonable cause to believe that a violation of the Act, as charged, has been committed. Douds v. Local 1250, Retail Wholesale Dept. Store Union of America, C.I.O., 2 Cir., 170 F.2d 695. In other words, the petitioner must make out a prima facie case that respondent has violated the secondary boycott section of the Act. Styles v. Local 760, Int. Brotherhood of Electrical Workers, A.F.L., D.C.Tenn., 1948, 80 F.Supp. 119, 122. The Court must then find that injunctive relief would be "just and proper". Section 10(l) of the Act; Douds v. Local 294, Int. Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L., D.C.N.D.N.Y.1947, 75 F. Supp. 414.

## The Facts

The charging party in the proceedings before the Board is the Montoya Trading Corp., a New York corporation engaged in the operation and servicing of cigarette vending machines, principally in cafes and grills in the New York and New Jersey area. The respondent, Local 1175, a labor organization within the meaning of the Act, has a closed-shop contract with the Cigarette Merchandisers Association, an association of concerns in the business of selling cigarettes by means of vending machines. Montoya is not a member of the association, nor are its employees members of Local 1175.

The association, it appears, had agreements with a majority of the bars and grills in the New York City area, and when Montoya entered the field it offered certain inducements to win contracts with establishments that were former customers of members of the association. It apparently has persuaded a number of them to cease doing business with the association and to enter into agreements with Montoya.

Under the agreements with the bars and grills, Montoya installs cigarette vending machines. The proprietor agrees to keep the machine in his establishment for the term of the contract (generally one to three years), and further agrees not to sell cigarettes through any other medium. Montoya agrees to keep the machines there for the period of the contract, and to keep it in good repair and stocked with cigarettes.

As soon as Montoya began to do business with establishments formerly serviced by Local 1175 men, it met with the resistance of Local 1175. The union felt aggrieved because its members were compensated, in part, on the volume of cigarettes sold through the machines of their employers, and to the extent that Montoya's machines replaced those of the employers of members of Local 1175, there was a potential source of injury to earnings of Local 1175 men. Furthermore, Local 1175 men were no longer needed to service and repair the machines replaced by Montoya.

The respondent, mainly through its business agent, one Samuel Lavergata, approached the proprietors of establishments which had replaced the machines owned by members of the association with those of Montoya. The proprietors were told that unless Montoya's machines were removed immediately the establishment would be picketed by Local 1175. At one establishment, Lavergata stated: "If I put a picket line out here, you will get no beer or deliveries of any kind, and no union men will come in." When the Montoya machine was not removed, Local 1175 began picketing. The pickets were sometimes withdrawn when the machine was turned to the wall or placed in such other manner that it could not be used; at other times picketing continued even though the Montoya machine was out of use. The presence of the picket lines interfered with the running of the picketed taverns and with the receipt of delivery of supplies— there is evidence that the pickets attempted to induce the bartenders not to work while picketing was carried on, and also to induce deliverymen not to make deliveries to picketed establishments. Some union deliverymen refused to make deliveries at all, others delayed deliveries until they could check with their union.

This pattern of conduct by Local 1175 was followed, in general, at several establishments that installed Montoya machines.

When picketing started, the picket signs carried the following legend: "The Cigarette Machine of This Establishment is Unfair to Organized Labor. Confectionery and Tobacco Jobbers Employees' Union, Local 1175, R.C.I.A. affiliated with American Federation of Labor." Sometime later the legend on picket signs was changed to read: "This Establishment is Unfair to the Members of Confectionery and Tobacco Employees' Union, Local 1175, Affiliated With American Federation of Labor."

The affidavits of the proprietors of several of the picketed taverns state that they never had any dealings with either Local 1175 or with the union that represents the service men employed by Montoya, United Coin Machine Employees Union, Local 254, CIO. They further state that while picketing continued, the business of their taverns was adversely affected.

### The Board's Position.

The Board relies on the wording of section 8(b)(4)(A) of the Act, which reads as follows:

"It shall be an unfair labor practice for a labor organization or its agents * * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where *an object* thereof is:

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * *." (Italics for emphasis.)

Against the above language, the Board contends that at least one purpose of the picketing was to induce the bar and grill owners to stop doing business with Montoya, and to resume dealing with the employers of Local 1175. In other words, in the language of the statute: Local 1175

induced and encouraged the employees of one employer (the tavern owners) and employees of suppliers attempting to make deliveries to taverns to engage in a strike or concerted refusal in the course of their employment to perform any service with *an object* thereof being to force or require an employer (the tavern owners) to cease using, selling, handling or otherwise dealing in the products of any other producer, processor or manufacturer (Montoya), or to cease doing business with another person (Montoya).

The Board further asserts that the union's activity amounts at least to a product boycott, which is one type of union action which this section of the Act was intended to prevent. Sen.Rept.No.105, 80th Cong. 1st Session (1947), pg. 22; 93 Cong.Rec. 3534, 4255, 7506.

### The Respondent's Position

Local 1175 justifies its action on two grounds: (1) the right to peacefully picket (there is no dispute but that the picketing involved herein was peaceful) is protected by the Constitution as a form of free speech, Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Carlson v. People of State of California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; A. F. L. v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855; (2) the dispute between Local 1175 and the tavern owners is a primary dispute and does not involve a secondary boycott or secondary picketing.

Concerning the primary dispute argument, the respondent urges that it has no dispute with anyone but the tavern owners; it never did, nor claimed to, represent employees of Montoya, and so has no dispute with it.

In respondent's answering affidavits it is stated that there were contracts in force between "at least six of the seven establishments" mentioned in the charge and distributors whose employees are members of Local 1175; that Montoya "induced the proprietors to breach their contracts"; that the "owners of the machines which had been serviced by members of Local 1175 and with whom the owners of the cafes,

bars and grills were under contract, have commenced action for damages for breach of contract."

The union asserts forcefully that if it cannot picket the taverns, there is no place else to picket. It cites the case of Douds v. Metropolitan Federation of Architects, Engineers, Chemists & Technicians, Local 231, D.C.S.D.N.Y.1948, 75 F.Supp. 672, in support of this contention, and also urges that a secondary boycott is limited to a situation where a union having a dispute with one employer attempts to force an innocent third party by means of picketing or other activity to influence the party with whom the union has its dispute to settle favorably to the union.

### Discussion.

 The union's first point concerning the right to peacefully picket as a form of free speech is without merit. If the picketing by Local 1175 had as its purpose, and for the sake of these proceedings if the Court reasonably believes that the purpose of the union was, to further a boycott in violation of section 8(b)(4)(A) of the Act, it is not protected either by the free speech guarantee of the Constitution, Amendment 1, or of section 8(c) of the Act. United Brotherhood of Carpenters and Joiners of America, etc., v. Sperry, 10 Cir., 170 F.2d 863; Printing Specialties and Paper Converters Union Local 388, A.F.L. v. Le Baron, 9 Cir., 171 F.2d 331; cf. also the recent Supreme Court decision in Giboney v. Empire Storage and Ice Co., 336 U.S. 490, 69 S.Ct. 684, 689, in which the Court said: "Neither Thornhill v. State of Alabama, supra, nor Carlson v. People of State of California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104, both decided the same day, supports the contention that conduct otherwise unlawful is always immune from state regulation because an integral part of that conduct is carried on by display of placards by peaceful picketers."

The Board has also ruled that peaceful picketing is not protected by section 8(c) of the Act when engaged in support of an unlawful boycott. Printing Specialties and Paper Converters Union, Local 388, A.F.L., 82 N.L.R.B. No. 36; Local 1796, United

Brotherhood of Carpenters and Joiners of America, 82 N.L.R.B. No. 26.

 Concerning the union's second argument, the Court does not see how respondent can validly assert that it has a primary labor dispute with the tavern owners. In Douds v. Metropolitan Federation of Architects, supra, on which respondent relies, Judge Rifkind specifically found an identity of interest between Ebasco, with whom the union had its dispute, and Project, to whom Ebasco subcontracted its work. As a result, the dispute of the union with Project was primary. On its facts, that case does not seem applicable to the situation herein.

 Undoubtedly, the members of Local 1175 stand to lose earnings from the activity of Montoya, and undoubtedly one purpose of the picketing involved was to help members of 1175 economically. However, section 8(b)(4)(A) of the Act "specifically forbids a union to 'induce and encourage' employees to withhold their labor in order to bring about a secondary boycott for an economic objective." United Brotherhood of Carpenters and Joiners of America, 81 N.L.R.B. No. 127, concurring opinion of Mr. Herzog. Mr. Herzog further stated: "It seems clear to me that Congress was attempting to deal a death blow to secondary boycotts, whether for economic or for other objectives, and desired to use all the power at its command to eliminate them from the American industrial scene."

 The evidence before the Court leads us to reasonably believe that "an object" (in the language of the statute) of Local 1175's activity was to induce the employees of the picketed taverns and employees of suppliers of those taverns to refuse to perform services in the course of their employment to induce the tavern owners to cease doing business with Montoya. As such it would appear that the union has violated the ban on secondary boycotts.

 If the tavern owners have violated contracts with members of the association, they are contracts to which the respondent is not a party. The union is aggrieved by the use of those taverns of Montoya's ma-

196

chines (see the original legend on the picket signs). Product boycotts are within the ban of 8(b)(4)(A).

Since the Board has established a prima facie case, the petition is granted and an injunction as provided for in section 10($l$) will issue enjoining and restraining respondent from engaging in said activities pending final adjudication by the Board of the charges now pending before it.

Submit order on notice.