**INTERNATIONAL RICE MILLING CO., Inc., et al. v. NATIONAL LABOR RELATIONS BOARD.**

No. 12909.

United States Court of Appeals
Fifth Circuit.

June 21, 1950.

---

Conrad Meyer, III, Lawrence A. Molony, Nicholas Callan, all of New Orleans, La., Elias R. Kaufman, Lake Charles, La., for petitioners.

C. Paul Barker, Special Counsel, N. L. R. B., New Orleans, La., David P. Findling, Associate General Counsel, N. L. R. B., Washington, D. C., A. Norman Somers, Assistant General Counsel, N. L. R. B., Washington, D. C., for respondent.

Before HOLMES, WALLER, and BORAH, Circuit Judges.

HOLMES, Circuit Judge.

Petitioners, pursuant to Section 10(f) of the National Labor Relations Act, as amended,[1] are asking this court to review a decision of the National Labor Relations Board, which dismissed their charges with regard to unlawful activity on the part of the union directed against the employees of railroad companies transporting petitioners' commodities, for the reason that the railroad companies were not "employers" within the meaning of Section 8(b) (4) of the Act, and which also dismissed that part of their charges which alleged that the union violated Section 8(b) (4), with regard to the employees of the Sales House, for the reason that the union's activities occurred in the vicinity of the plant.

1. 29 U.S.C.A. § 160(f).

of the "primary" employer and, therefore, were not subject to these provisions of the Act.

Petitioners are in the business of operating rice mills in and around Crowley, Louisiana, which is the center of the rice industry in that state. In 1946, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 201, A. F. L., hereinafter referred to as the union, began an organizational campaign among petitioners' employees. In February, 1947, the union could not prove its majority status among the employees. In September, 1947, the union renewed its organizational activities, and on September 3, 1947, called a strike among petitioners' employees. Enough of the employees remained on the job to keep the mills in operation. Some of those out on strike picketed the mills, and extended their picket lines across the tracks of the Missouri Pacific and Southern Pacific Railroad Companies. At first, the employees of the railroad companies paid no attention to the pickets, and continued to switch cars to and from the mills. On September 15, 1947, the union sent a letter to the chairman of the grievance committee of the Brotherhood of Railroad Trainmen, to which many of the railroad employees belonged, telling him of the union's strike at the petitioners' plants and asking him to have the railroad employees respect the picket lines. The letter did not achieve its purpose, and the railroad employees continued to cross the picket lines. On October 13, 1947, the president of the union called a representative of the Railroad Brotherhood, and told him that the railroad employees might be shot with buckshot if they did not respect the picket lines. The railroad representative went to see the union president and, during their conversation, the president told him of the restlessness of the strikers, and stated that all he could do to any member of his union who committed violence was to suspend him from the union.

On the night of October 15th, the railroad representative received three telephone calls; the last call was made at about 2:00 A.M., and threatened "if our pickets won't stop you, dynamite will." The next day the train crews were informed of these threats and instructed that, in performing their duties, each one of them should use his own discretion in deciding whether or not it was safe to cross the union's picket lines, which thereafter contained from 15 to 30 pickets on the railroads' right-of-ways. The railroad employees, fearful of bodily injury to themselves and their families, refused to cross the picket lines. The seriousness of their refusal to shift rail cars in and out the mills was felt by the rice farmers, who found themselves unable to harvest their crops, because the mills could not dispose of the rice they had on hand, and thus could not help the farmers handle their highly perishable crops, which rapidly deteriorated unless milled and dried within a short time after being harvested.

On October 22, 1947, the railroad companies applied to the district court in Louisiana to have the picketing on its tracks enjoined, and a preliminary injunction was issued against the union ordering it to cease interfering with the operation of the railroad companies' business with petitioners' mills. The union ceased picketing the railroad tracks, but continued to picket petitioners' plants until the end of 1947. Another similar incident took place in Kaplan, Louisiana, when a large number of pickets refused to let a truck, owned and operated by the Sales House, enter to pick up a load of rice. After being turned away at one gate, the truck driver attempted to enter the rice mill by another way, but the same group of pickets stoned the truck and again prevented its entrance to the mill.

Petitioners filed charges with the Board, alleging that the union had violated Section 8(b) (4) (A) and (B) of the Act by inducing and encouraging the railroad employees and the employees of the Sales House, a grain warehouse, to cease doing business with them and to cease transporting their merchandise. As a result of these charges, a hearing was held on March 25, 1948, and the trial examiner found that the union had violated Section 8(b) (4) (A) and (B) and recommended that the Board issue an order directing the union to cease

and desist from further activity, along these lines. On June 20, 1949, the Board issued its decision, which dismissed petitioners' charges with regard to any wrongful activity of the union, directed against the employees of the railroad companies, because it was of the opinion that the railroad companies were not "employers" within the meaning of Section 8(b) (4) (A) and (B) of the Act; the Board also dismissed petitioners' charges which alleged that the union had violated these sections of the Act regarding the employees of the Sales House, for the reason that the union's activities had occurred in the vicinity of the plant of the primary employer and, therefore, were not subject to the provisions of Section 8(b) (4) (A) and (B) of the Act. It is the decision of the Board dismissing these charges that the petitioners are asking this court to review.

The questions presented for our determination are purely issues of law, and are two in number. First, we must decide whether an employer who is subject to the Railway Labor Act, 45 U.S.C.A. § 151 et seq., is an employer within the meaning of Section 8(b) (4) (A) and (B) of the National Labor Relations Act; second, whether the inducement of employees of a neutral employer not to transport goods, by picketing and other related activities conducted at the situs of a primary (struck) employer's place of business, is prohibited by Section 8(b) (4) (A) and (B) of the Act.

We disagree with the Board's holding that the words "any employer," as used in that section of the statute in question here, do not include railroad companies as employers. Section 8(b) (4) provides as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

    \*     \*     \*     \*     \*     \*

(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is:

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

(B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 \* \* \*;

(C) \* \* \*

(D) \* \* \*

Provided, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter;

\* \* \*."

Section 2(2) defines the term "employer" as follows:

"(2) The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

■ We are of the opinion that the situation before us now was intended to be covered by the above-mentioned Section 8(b) (4) of the Act. The purpose of Section 8(b) (4) (A) and (B) is to protect commerce from injury, impairment, and

interruption, by removing obstructions like the one we have here. If the Board's view were to prevail, the industry most directly and extensively concerned with commerce, the vast railroad transportation system, would be at the mercy of ambitious unions, which could use them as a means of forcing themselves upon plants like petitioners where they do not have a majority status. There is no doubt that Congress intended to exclude railroad companies and their employees from the National Labor Relations Act in so far as the regulation of labor relations was concerned. The Railway Labor Act, 45 U.S.C.A. § 151 et seq., is a separate and earlier piece of legislation than either the Wagner Act, 29 U.S.C.A. § 201 et seq., or the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and for that reason Congress permitted the law governing the rights and duties of the railroad companies and their employees to remain unchanged. Section 8(b) (4) of the National Labor Relations Act, as amended in 1947, as applied to this case, does not seek to enter the field of railway labor relations. Petitioners are not asking that anything be done to the railroad companies or their employees, or that they be compelled to do anything. All petitioners seek is a removal of the railroads and their employees from the scope of a labor-management conflict in which they have no interest and want no part. We think Congress provided for the removal of such obstacles from the free flow of interstate commerce when it enacted Section 8(b) (4).

A close reading of the language used in Section 8(b) (4) convinces us that, by the use of the words "any employer," Congress intended to extend the section to any and all situations relative to the one we have before us. In this particular section, the usage of the word "any," as applied to the term employer, is confined solely to subsection (4). Contrasting the usage of the word "any," as found in subsection (4), with the use of the indefinite article "an," as used elsewhere in the section, gives rise to the inference, we think, that Congress

intended the word "any" to embrace the class of employers as a whole, and not merely those within the definition of "employer," as set forth in Section 2(2) of the Act. In construing a statute, it is necessary that every word be given significance and effect, and every part of the statute must be construed in connection with the whole, so as to make all parts harmonize. Thus, if Congress had intended the word "employer" to mean only such employers as defined in Section 2(2), it would have preceded the word by the indefinite article "an." Since this was not done, we think it reasonable to conclude that the word "employer," as used in Section 8(b) (4), was intended to have a wider and more inclusive meaning than the definition found in Section 2(2).

A further reading of Section 8(b) (4) (A) reveals the language "forcing or requiring * * * any employer or other person to cease using, selling, handling, transporting or otherwise dealing * * *." The definition of the word "person" in the Act does not exclude railroad companies. The words "any employer," as used in Section 8(b) (4), appear to us to refer to the same employer as described in Section 8(b) (4) (A) by the words "any employer or other person." Thus we see the use of the words "any employer or other person" being used to amplify and explain the words "any employer." Since the word "person," as defined in the Act, does not exclude the railroad companies, and since it is used here in connection with the words "any employer," we think it highly persuasive of the fact that railroad companies were not intended to be excluded from the purview of Section 8(b) (4) (A) and (B) of the Act. *Noscitur à sociis:* the meaning of a word may be ascertained by reference to the meaning of words associated with it.[2]

By construing the language of the statute so as to include railroad companies within the meaning of the words "any employer," we are giving effect to the intent of Congress to stop secondary boycotts in the transportation industry. If such an in-

2. Broom's Legal Maxims, 4th Edition, p. 374.

terpretation is not allowed, the meaning and use of the words "transport" and "transporting," used throughout the section, would be rendered ineffective and almost useless, since the railroads transport the vast bulk of freight in this country. Courts usually will avoid interpreting a statute so as to render it ineffective, or to cause grave public injury, if there is a more reasonable interpretation that can rightfully be adopted.

We do not agree with the Board's holding that the union's activities in refusing to allow a truck owned and operated by grain warehousemen were not violative of Section 8(b) (4) (A) and (B) of the Act. The Board assigns as the reason for its holding, the fact that the union's activities arose out of primary picketing, and that, since they were carried out in the immediate vicinity of the mill, they were not violative of the Act. The Board attempts to draw a fine distinction between primary and secondary action. Although the term "secondary boycott" does not appear anywhere in the section in question, the section itself is often referred to as the "secondary boycott" section and is most commonly understood to make secondary boycotts an unfair labor practice. We know of no accurate definition for the term "secondary boycott." When secondary boycotts were discussed in the Senate in connection with the passage of the Taft-Hartley Act, Senator Taft said: "It has been set forth that there are good secondary boycotts and bad secondary boycotts. Our committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have broadened the provision dealing with secondary boycotts as to make them an unfair labor practice." 93 Daily Congressional Record 4323 (April 29, 1947).

The statute clearly provides a remedy for the type of conduct engaged in by the union, without resort to any distinction between primary and secondary activities. If the union's activities come within the language of the statute, they constitute an unfair labor practice, regardless of whether they might have been considered a true "secondary boycott" under the old common law or under any of the modern and popular theories. The trial examiner found that the pickets refused to allow a truck, owned by the Sales House, a neutral grain warehouse operator, to enter petitioners' mill; that when it attempted to enter on another street, the pickets threw stones at it; and that the pickets did not represent a majority of petitioners' employees. The Board did not overturn any of these findings, but merely concluded that, since they occurred in the immediate vicinity of the struck employer's plant, they were primary activities and not within the coverage of the statute prohibiting secondary boycotts. No decision was made on the restraint, coercion, or violence of the strikers, because not alleged in petitioners' complaint; but the Board did state that, while violence was not to be condoned, even if there was violence it would not convert primary picketing into secondary action within the meaning of the Act.

Comparing the union's activities with the plain wording of the statute, it is apparent to us that the union was attempting to induce and encourage the employees of the Sales House to refuse to transport or otherwise handle the goods and commodities of the rice mills. The purpose of such action was to compel the rice mills to recognize the union as the representative of its employees, although it did not represent a majority of the employees. There was violence as evidenced by the trial examiner's finding that the truck was stoned, though the Board did not find it necessary to rule on same. The circumstances surrounding this action, all of which the trial examiner was keenly aware of, prompted a finding by him contrary to that of the Board. We do not think the ends of justice will be best served if we allow the Board to overturn this finding merely because it considers all the activities to be primary instead of secondary. It seems to us that these activities became secondary when the strikers attempted to induce and encourage the employees of this neutral employer Sales House. The fact that they occurred near the struck employer's plant is not enough to draw such a distinction as the

Board attempts to draw, especially where there is violence. The gravamen of the offense prohibited by the statute is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some neutral employer who has no concern in the dispute, and its aim is to compel him to stop business with the employer in the hope that the employer will be induced to submit to the demands of the strikers. To allow the Board to rule such activity as prohibited by the statute not to be a violation thereof, simply because it occurred in the vicinity of the struck employer's plant, would render the section ineffective and insufficient.

The Board erred in its interpretation of Section 8(b) (4) (A) and (B), and for that reason its order dismissing petitioners' complaint is hereby set aside, and the case is remanded to the Board for further proceedings not inconsistent with this opinion.