**DENVER BUILDING AND CONSTRUC-
TION TRADES COUNCIL et al. v. NA-
TIONAL LABOR RELATIONS BOARD.**

No. 10271.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 15, 1950.

Decided Sept. 1, 1950.
Writ of Certiorari Granted Dec. 11, 1950.
See 71 S.Ct. 281.

Clark, Circuit Judge, dissented in part
and concurred in part and in the result.

Mr. William E. Leahy, Washington, D. C., with whom Messrs. Louis Sherman and Martin F. O'Donoghue, Washington, D. C., were on the brief, for petitioners.

Mr. Winthrop A. Johns, Assistant General Counsel, Washington, D. C., with whom Messrs. A. Norman Somers, Assistant General Counsel, and Dominick L. Manoli, attorney, all of the National Labor Relations Board, Washington, D. C., were on the brief, for respondent.

Before EDGERTON, CLARK and FAHY, Circuit Judges.

FAHY, Circuit Judge.

The Denver Building and Construction Trades Council, referred to as the Council, the International Brotherhood of Electrical Workers, A. F. L. Local 68, referred to as the I. B. E. W., and the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, A. F. L. Local 3, petition this court to set aside an order of the National Labor Relations Board. The Board answers and requests enforcement of its order.

In essence the order requires petitioners to cease and desist from engaging in or inducing or encouraging the employees of a contractor, known as Doose & Lintner Construction Co., to engage in a strike with an object of forcing it "to cease doing business with" an electrical concern known as Gould & Preisner.

The contractor, Doose & Lintner, was constructing a commercial building on Bannock Street in Denver. Gould & Preisner were subcontractors for some electrical work and supplies. Their employees were non-union. All other employees on the job including those of other subcontractors as well as of the contractor, were members of craft unions affiliated with the petitioning Council. A representative of the I. B. E. W. complained to the electrical subcontractor about non-union men working on the job and reported to the business representative of the Council that the contractor was using the services of this subcontractor. The Council decided to place a picket stating that the Bannock Street job was unfair to the Council. After advising members of the contracting and of the electrical subcontracting firms that union men could not work on the job with non-union men and if the subcontractor worked there the Council would have to picket the job as "unfair", picketing in fact began

with a placard reading "This Job Unfair to Denver Building and Construction Trades Council". During the period of picketing, from January 9 through January 22, 1948, no union members worked on the project.

The Board held that petitioners had engaged in an unfair labor practice violative of § 8(b) (4) (A) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 158(b) (4) (A), the pertinent part of which, with its immediate context, is set forth in the margin.[1]

## I. Jurisdiction

We consider first the question of the Board's jurisdiction under the Commerce Clause, strongly contested by petitioners. The Board's authority extends to unfair labor practices "affecting commerce", that is, "in commerce, or burdening or obstructing commerce or the free flow of commerce", 29 U.S.C.A. § 152(7). Commerce is defined as interstate and foreign commerce. Id. § 152(6).

The alleged unfair practice was not in commerce itself as defined in the Act. There is no evidence or definite finding of any interstate or foreign commerce at the Bannock Street location. The only interstate commerce involved even indirectly, so far as the evidence or findings enlighten us, is the annual purchase by the electrical subcontractor of approximately $56,000 of goods which move to its place of business in Denver from out of the State. As to the Bannock Street building itself the finding is that $348.55 of the subcontractor's materials were used there prior to termination of its services as a result of the picketing and consequent strike. There is no evidence that any of this material actually came from without the State, but it was assumed by the Board that since 65% of all the purchases of Gould & Preisner were so derived a like percentage of the materials used on the Bannock Street job had a like derivation. The report of the trial examiner, adopted in this respect by the Board, found that "any widespread application of such practices might well result in substantially decreasing the inflow of materials" from points outside Colorado; that "Gould & Preisner's annual inflow of over $55,000 worth of materials is not negligible. Such an inflow is sufficient to establish the Board's jurisdiction".

We do not disturb the assertion of jurisdiction by the Board though the decision in this regard is a close one. The stated basis of jurisdiction would rest firmly enough upon the principles of decided cases under the Labor Act had the events in question occurred at the premises of Gould & Preisner. There the incoming interstate movement of goods would be obstructed or threatened with obstruction by the relationship of the forbidden practices to industrial strife. The holding in National Labor Relations Board v. Fainblatt, 1939, 306 U.S. 601, 607, 307 U.S. 609, 59 S.Ct. 668, 672, 83 L.Ed. 1014, that "we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim *de minimis*" is more than broad enough to bring within the coverage of the Act, so far as quantity is concerned, the interstate purchases of Gould & Preisner. The fact that their movement was from out of the State into Colorado, rather than the reverse, would not change the result. The impact of industrial strife on interstate commerce at its destination, as well as at its origin, is sufficiently close to meet the requirements of the statute and the Commerce Clause. International

1. "Sec. 8 * * *
    "(b) It shall be an unfair labor practice for a labor organization or its agents— * * *
    "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike * * * where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * *".

Brotherhood of Electrical Workers v. N. L. R. B., 2 Cir., 1950, 181 F.2d 34. See, also, United States v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 121, 62 S.Ct. 523, 86 L.Ed. 726; United States v. Sullivan, 1948, 332 U.S. 689, 698, 68 S.Ct. 331, 92 L.Ed. 297 [regulation of branding of articles that have completed interstate shipment and are being held for local sale]; N. L. R. B. v. J. L. Hudson Co., 6 Cir., 1943, 135 F.2d 380, certiorari denied 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 439; J. L. Brandeis & Sons v. N. L. R. B., 8 Cir., 1944, 142 F.2d 977, certiorari denied 323 U.S. 751, 65 S.Ct. 85, 89 L.Ed. 601; N. L. R. B. v. May Department Stores, 8 Cir., 1944, 146 F.2d 66, modified in other part 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 [unfair labor practice in department store purchasing large amounts of stock in interstate commerce]; N. L. R. B. v. Van De Kamp's Holland Dutch Bakers, 9 Cir., 1946, 152 F.2d 818. Here, however, the immediate impact of the controversy was not the place of business of Gould & Preisner but the Bannock Street location. None of the cases heretofore decided by the Supreme Court under the Labor Act presents a similar jurisdictional situation. In each, as illustrated by the Fainblatt case, the unfair labor practice occurred at a place of business where interstate commerce was engaged in though the effect of the forbidden practice was felt first on a local activity such as production or manufacturing. In some of the recent cases decided by the courts of appeals involving the building construction business the impact has also been immediate in point of location. Thus in International Brotherhood of Electrical Workers v. N. L. R. B., 2 Cir., 1950, 181 F.2d 34, interstate commerce moved directly to the site of the job where the picketing occurred. So also in Shore v. Building & Construction Trades Council, 3 Cir., 1949, 173 F.2d 678, 8 A.L.R.2d 731, an injunction action under section 10(l), 29 U.S.C.A. § 160(l). On the other hand, in United Brotherhood of Carpenters, etc. v. Sperry, 10th Cir., 1948, 170 F.2d 863; N. L. R. B. v. Local 74, United Brotherhood of Carpenters, etc., 6 Cir., 1950, 181 F.2d 126 and Slater

v. Denver Building and Construction Trades Council, 10 Cir., 1949, 175 F.2d 608, as in the case at bar, there was a definite break in the route of the material. In each of the cases last cited the material whose origin was interstate had come to rest locally at the place of business of the boycotted concern before moving locally to the building site where the industrial strife occurred. Jurisdiction was sustained on the theory that the boycotted concern received substantial quantities of goods from out of the State and this interstate business would be adversely affected. In Groneman v. International Brotherhood of Electrical Workers, 10 Cir., 1949, 177 F.2d 995, however, jurisdiction of the district court under § 303(b) of the Act, 29 U.S.C.A. § 187(b), was held to be lacking in such circumstances.

Of course the fact that the activity at Bannock Street was itself local is no bar to jurisdiction. Numerous Labor Board cases, including the leading decisions of N. L. R. B. v. Jones & Laughlin, 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, and companion cases, as well as other decisions before and after, under other exercises by Congress of the commerce power, including Wickard v. Filburn 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, leave no doubt as to this. It may be noted, however, that the basic principle underlying Wickard v. Filburn is not applicable to the present case. There Congress found that in order properly to regulate the interstate market in wheat it was essential to regulate the use of wheat on the farm, including its consumption there. This was a regulation by Congress of a particular local aspect of the whole of a particular commodity in order to control and protect its interstate aspects. The principle is comparable to that expounded in the rate cases (see Shreveport case, Houston, East & West Texas Ry. Co. v. U. S., 1914, 234 U.S. 342, 351–353, 34 S. Ct. 833, 58 L.Ed. 1341). In the Labor Act, however, no finding was made by Congress that all unfair labor practices affect commerce (see N. L. R. B. v. Jones & Laughlin, supra, 301 U.S. at page 31, 57 S.Ct. 615); the required effect must be

shown in each case. (Id., 301 U.S. at page 32, 57 S.Ct. 615.)

■ In the case at bar, as stated, the interstate commerce relied upon as a basis for jurisdiction ended at the warehouse and offices of the electrical subcontractor and did not extend to the location where the unfair labor practices occurred.[2] We note, however, that in addition to the Bannock Street project another job in Denver known as the Lo Sasso project was the subject of controversy affecting Gould & Preisner. While the Board found no unfair labor practice at that place the facts regarding the material used there are relevant to the jurisdictional question. It too was a small job, comparable to Bannock Street, insofar as the electrical work of Gould & Preisner was concerned. But the circumstance that two controversies affecting the same concern at or about the same time appear in the same record illustrates the recurrent character of the problem. Such stoppages in the work of this concern would in a practical and economic sense adversely affect its total business, including its out-of-state purchases. While the actual goods involved at the two sites are not satisfactorily shown to have derived from interstate commerce, the threatened or actual stoppage of work on these and similar projects reasonably should be held to affect significantly the total business of the concern, a substantial part of which is interstate. The closeness of the case on the record before us is due in part no doubt to the absence of evidence as to all that could have been proved, such as the origin of the goods used at the Bannock Street job as a whole, not alone those used there by Gould & Preisner, and the absence also of clearer proof of the source of materials used by Gould & Preisner at the Bannock Street and Lo Sasso sites. Nevertheless we think jurisdiction should not be denied. "Appropriate for judgment is the fact that the immediate situa-

tion is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce. N. L. R. B. v. Fainblatt, supra, 306 U.S. at pages 607–608, 59 S.Ct. at page 672, 83 L.Ed. 1014". Polish National Alliance v. N. L. R. B., 1944, 322 U.S. 643, 648, 64 S.Ct. 1196, 1199, 88 L.Ed. 1509. It is quite true that in the Polish National Alliance case the interstate commerce involved was extensive, but the considerations referred to have present pertinence. The reference to the Fainblatt opinion is no doubt to the statement there made,

"There are not a few industries in the United States which, though conducted by relatively small units, contribute in the aggregate a vast volume of interstate commerce. * * *" 306 U.S. at page 607, 59 S.Ct. at page 672.

See, also, Wickard v. Filburn, supra, 317 U.S. at page 124, 63 S.Ct. at page 88, where is is said:

" * * * Once an economic measure of the reach of the power granted to Congress in the Commerce Clause is accepted, questions of federal power cannot be decided simply by finding the activity in question to be 'production' nor can consideration of its economic effects be foreclosed by calling them 'indirect.' * * *"

On this record, while indirect, the economic effect is there and justifies the assertion of jurisdiction from a constitutional standpoint. Though in our view of the evidence and findings the case is on the jurisdictional borderline we think the line has not been crossed.

## II. The Question of Res Judicata.

The petitioners contend that the question of jurisdiction has been judicially determined adversely to the Board in a manner which precludes its reconsideration. The Board through its Regional Director petitioned the District Court of the United States for the District of Colorado under

2. Even on the assumption of the trial examiner, apparently approved by the Board, that 65% of its total purchases were interstate and therefore that 65% of the $348.55 of materials used on the Bannock Street job were of like origin, this material was no longer in interstate commerce.

§ 10(*l*) of the Act, 29 U.S.C.A. § 160 (*l*), set forth in the margin,[3] to enjoin the questioned conduct pending final adjudication of the matter by the Board. The court held the matters involved were purely local and did not affect commerce within the meaning of the Act. Appeal was taken to the court of appeals and dismissed by the Board with that court's consent. It is said the doctrine *res judicata* bars the assertion of jurisdiction by the Board in these proceedings subsequently initiated. The scheme of the statute requires us to reject this view.

Proceedings in the District Court and those before the Board are independent. The Board's action now under review is on a record made before its trial examiner and brought before the Board for decision in accordance with the authority set forth in § 10 of the statute. The Board is empowered there to prevent unfair labor practices, and "This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise" (ibid). We do not think action of the District Court under § 10(*l*) is intended to interfere with the dominant authority of the Board and courts of appeals in the formulation of orders under § 10(a) and (b) and in their enforcement under § 10(e) and (f). Resort to the District Court under § 10(*l*) is only for "appropriate injunctive relief pending the final adjudication of the Board * * *." The Board's authority is not limited, expressly or by implication, to cases in which an injunction under this section is sought on its behalf, or when sought, is granted. Since two remedies are provided in the statute for the purpose of accomplishing two separate though related purposes of Congress, one in the District Court of a preliminary or interlocutory character, the other before the Board and reviewing courts, of a final character, the separate means designed by Congress for the accomplishment of these purposes must not be permitted to impair the freedom and effectiveness of either. In the one case the Board through the regional attorney or other officer is a litigant seeking an interlocutory injunction against the continuance of an alleged unfair labor practice pending final adjudication by the Board. In the other the Board is itself the initial tribunal which makes a final decision subject to review and correction by an appropriate court of appeals or by the Supreme Court. §§ 10(a), (b), (e), (f). Review and determination by the judiciary of the jurisdictional question arising under the Commerce Clause is available; but a final and binding determination in that regard may not be compelled until an initial decision has been made by the Board on the record before it, unless perchance the Board abandons the procedures available to it under §§ 10(a), (b) and (f), and pursues only those set forth in § 10(*l*).

This statutory scheme distinguishes the case from Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263, and Otis & Co. v. Securities and Exchange Commission, 1949, 85 U.S.App.D.C. 122, 176 F.2d 34.[4] In

---

3. "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8(b), the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the District Court of the United States for the Dis-

trict of Columbia) within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: * * *."

4. The Otis case was reversed by the Supreme Court, 1949, 338 U.S. 843, 70 S.Ct. 89, because of failure to exhaust admin-

these cases there was no comparable structure erected by Congress for two independent proceedings. Where the application of the judicial doctrine *res judicata* would be inconsistent with the method devised by Congress the doctrine will not be enforced by the courts. Kalb v. Feuerstein, 1940, 308 U.S. 433, 444, 60 S.Ct. 343, 84 L.Ed. 370. It is for this reason we hold against the contention of petitioners, and not because of lack of any of the elements which usually make out a case for the application of *res judicata*. The doctrine is not to be used where the circumstances create a semblance of conditions for its application but to apply it would submerge the plan of Congress for the administration and enforcement of its policy.

### III. The Unfair Labor Practice.

A. In order to treat adequately this aspect of the case at this point some repetition of facts is indulged. A summary of the findings of the trial examiner adopted by the Board, is that the principal contractor, Doose & Lintner, entered into arrangements with Gould & Preisner for the latter to do certain electrical work, including the furnishing of materials, on the Bannock Street job. Other subcontractors were also engaged for brickwork, cement and steel work, and plumbing. The electricians employed by Gould & Preisner were non-union but all men employed directly by Doose & Lintner and all employees of subcontractors other than Gould & Preisner were members of unions affiliated with the Council. Lintner was advised by a representative of the Council "that he would have to 'notify his members' by picketing that non-union men were working on the job. * * * if Gould & Preisner worked on the job they would have to put a picket on it to notify their members that the job was unfair". It was " 'too big a job' for the unions to permit non-union electricians to work on it".[5] The picket carried a placard, "This Job Unfair to Denver Building and Construction Trades Council". As a result all employees except the non-union electricians

of Gould & Preisner quit work for about two weeks. At the end of that time, and before Gould & Preisner had finished their subcontract, a letter was sent to them advising that their services were terminated since "It now appears * * * that your employees are unable to perform services while the employees of other subcontractors are working on the premises". All union labor was thereupon employed, the picket was removed and the job was completed. Just prior to the picketing, and while Gould & Preisner were still working, the contractor, in anticipation of the picketing, took his union carpenters to another job upon which all the men were members of unions affiliated with the Council. These carpenters and other employees continued their work there during the picketing of the Bannock Street project even though the non-union employees of Gould & Preisner were then working at the latter place.

From the foregoing it appears that the picketing was due to the fact that non-union labor was employed on the same job with the union men affiliated with the Council.

B. Section 8(b) (4) (A) makes it an unfair labor practice for a labor organization to engage in a strike where an object thereof is to force or require any employer "to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person". The Board adopted the conclusion of the trial examiner that the agents of the petitioners were engaged in an enterprise "of which an object was forcing * * * Doose & Lintner to cease doing business with Gould & Preisner". Petitioners contend that the action taken was primary and not secondary and therefore was outside the invoked statutory provisions designed to prevent secondary boycotts and secondary strikes.

■ It is quite true we think that the provisions of § 8(b) (4) (A) here involved are directed against secondary boycotts and

istrative remedies. The res judicata question was not reached by the Supreme Court.

5. The quoted excerpts are from the Findings of Fact of the trial examiner, adopted by the Board.

secondary strikes. The words "cease doing business with any other person" must be read with this in mind and interpreted in their setting. Not every strike which might be construed to have as an object the forcing of someone to "cease doing business" with someone else is prohibited. Douds v. Metropolitan Federation of Architects, etc., D.C.S.D.N.Y.1948, 75 F.Supp. 672, 675; United Electrical, Radio and Machine Workers, etc. and Ryan Construction Corporation, July 29, 1949, 85.N.L.R.B. No. 76; Oil Workers International Union and the Pure Oil Company, 1949, 84 N.L.R.B. 315. But cf., contra, International Rice Mills v. National Labor Relations Board, 5 Cir., 1950, 183 F.2d 21. The clause must be read with the provision preserving the right to strike except as specifically provided otherwise:

"Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." Section 13, 29 U.S.C.A. § 163.

The history of the statute aids to give meaning to the words. Senator Taft, co-author of the Bill and its manager on the floor of the Senate, explained that § 8(b) (4) (A) was to make a secondary boycott an unfair labor practice.[6] The Conference Report is to like effect.[7] The Senate Committee on Labor and Public Welfare (Senate Report No. 105, 80th Cong., 1st Sess., page 3) likewise shows this intent and purpose.[8]

In other cases the Board has adopted the meaning ascribed to the provision by Senator Taft:

" * * * Section 8(b) (4) (A) was not intended by Congress, as the legislative history makes abundantly clear, to curb primary picketing. It was intended

6. "The fourth unfair labor practice is an extremely important one. It is made an unfair labor practice for any union to engage in a secondary boycott." 93 Cong. Rec. 3838 (1947).
Later he also said:
"This provision makes it unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees. * * * All this provision of the bill does is to reverse the effect of the law as to secondary boycotts. It has been set forth that there are good secondary boycotts and bad secondary boycotts. Our committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have so broadened the provision dealing with secondary boycotts as to make them an unfair labor practice." 93 Cong.Rec. 4198 (1947).

7. "Under clause (A) strikes or boycotts, or attempts to induce or encourage such action, were made unfair labor practices if the purpose was to force an employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of another, or to cease doing business with any other person. Thus it was made an unfair labor practice for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B. Similarly it would

not be lawful for a union to boycott employer A if he uses or otherwise deals in the goods of or does business with employer B." House Report No. 510, 80th Cong., 1st Sess., p. 43.

8. "The major changes which the bill would make in the National Labor Relations Act may be summarized as follows:
* * *
"3. It gives employers and individual employees rights to invoke the processes of the Board against unions which engaged in certain enumerated unfair labor practices, including secondary boycotts and jurisdictional strikes, which may result in the Board itself applying for restraining orders in certain cases."
Page 22 of the report goes on to say:
"Under paragraph (A) strikes or boycotts, or attempts to induce or encourage such action, are made violations of the act if the purpose is to force an employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of another, or to cease doing business with any other person. Thus, it would not be lawful for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B; nor would it be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of or does business with employer B (with whom the union has a dispute). * * * *"

only to outlaw certain *secondary* boycotts, whereby unions sought to enlarge the economic battleground beyond the premises of the primary Employer. When picketing is wholly at the premises of the employer with whom the union is engaged in a labor dispute, it cannot be called 'secondary' even though, as is virtually always the case, an object of the picketing is to dissuade all persons from entering such premises for business reasons. * * *" United Electrical, Radio and Machine Workers, etc. and Ryan Construction Corporation, supra.

In Oil Workers International Union, etc. and Pure Oil Company, supra, the Board said:

"* * * any accompanying picketing of the employer's premises is necessarily designed to induce and encourage third persons to cease doing business with the picketed employer. It does not follow, however, that such picketing is therefore proscribed by Section 8(b) (4) (A) of the Act.

"It is clear from the legislative history of the Act that Section 8(b) (4) (A) was aimed at *secondary* and not primary action.

\* \* \* \* \* \*

"* * * The fact that the Union's primary pressure on Standard Oil may have also had a secondary effect, namely inducing and encouraging employees of other employers to cease doing business on Standard Oil premises, does not, in our opinion, convert lawful primary action into unlawful secondary action within the meaning of Section 8(b) (4) (A). To hold otherwise might well outlaw virtually every effective strike, for a consequence of all strikes is some interference with business relationships between the struck employer and others."

The courts have uniformly construed the provision as aimed at secondary action. Thus, in Printing Specialties and Paper Converters Union v. Le Baron, 9 Cir., 1948, 171 F.2d 331, 334, the court said:

"* * * Congress has now undertaken, in the exercise of its power under the Commerce Clause, art. 1, § 8, cl. 3, to prohibit altogether or sharply to curtail the use by labor organizations of certain economic weapons which they have heretofore freely employed. In an effort to narrow the area of industrial strife, and thus to safeguard the national interest in the free flow of commerce, it has in effect banned picketing when utilized to conscript in a given struggle the employees of an employer who is not himself a party to the dispute. Such we understand to be the purport of § 8(b) (4) (A) of the Act."

See, also, International Brotherhood of Electrical Workers v. National Labor Relations Board, 2 Cir., 1950, 181 F.2d 34, 35, where Judge Learned Hand said for the court:

"* * * The appeal presents two questions: * * * (2) whether the evidence before the Board supported its finding that the 'local' had engaged in conduct which constituted a secondary boycott, forbidden by the Act. * * *"[9]

■ The context of the words "cease doing business" and the meaning attributed to them by the legislative history of the Act, by the Board and by the courts, require that they be construed as condemning as an unfair labor practice a secondary boycott or strike but not primary action even when an object in a limited sense may be construed to be to force or require an employer to cease doing business with another. The effective sense must be that of the statute. We realize that when a statute is sufficiently broad in terms to cover a situation it will ordinarily be construed to do so even though other and different situations were in the mind of Congress at the time of enactment. Nevertheless the scope of a statute must still be interpreted so as to carry out the intent of Congress. See Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 489, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. Since

9. In that case the court, as elaborated upon *infra*, in circumstances somewhat comparable to those here involved, held that the picketing was secondary and therefore prohibited. See, also, to like effect United Brotherhood of Carpenters, etc. v. Sperry, 10 Cir., 1948, 170 F.2d 863.

it is clear the "cease doing business" clause, when read with the clause preserving the right to strike except as specifically provided, is not to be literally construed, its bounds must be sought. The history of the clause before, during and since enactment, in Congress, before the Board and in the courts, places primary labor action outside those bounds.

C. The final problem, therefore, is to determine whether the action here was of a secondary or primary character. If the former the Board properly ordered its cessation. If the latter its order should not be approved. The usual secondary boycott or strike is against one who is not a party to the original dispute. It is designed to cause a neutral to cease doing business with, or to bring pressure upon, the one with whom labor has the dispute. It seeks to enlist this outside influence to force an employer to make peace with the employees or labor organization contesting with him. See the Conference Report, supra, footnote 6. The situation before us is not of this character. The picketing and resulting strike were at the premises of the contractor where the subcontractor's men were at work. It grew out of a controversy over the conduct of the contractor in participating in the bringing of the non-union men onto the job as well as over the conduct of the electrical subcontractor in employing them. The purpose of the Council was to render the particular job all union. It was not to require Gould & Preisner to unionize their shop located elsewhere or to bring pressure against Doose & Lintner at any other place because of the employment of Gould & Preisner at Bannock Street. Accordingly the object was not in any literal sense to require Doose & Lintner to cease doing business with Gould & Preisner. The pressure was limited to the one job, which was picketed as a whole to make it wholly union and in protest against the employment there of the non-union electricians.

It is of some help to contrast this case with, for example, Labor Board v. Wine, Liquor and Distillery Workers, etc., 2 Cir., 1949, 178 F.2d 584; United Brotherhood of Carpenters, etc. v. Sperry, supra; Printing Specialties and Paper Converters Union v. Le Baron, supra, and Slater v. Denver Building and Construction Trades Council, 10 Cir., 1949, 175 F.2d 608. In all these cases where an unfair labor practice was held to have occurred the object was to bring pressure on the employer with whom the union had its dispute by the "conscripting of innocent neutrals", an activity § 8 (b) (4) (A) is devised to prevent. In each case the location of the strike was entirely separate from that of the concern against which the ultimate pressure was sought to be directed. The action of the employees was not against the job where the non-union men were employed, as in the case at bar. In none of the following district court cases as well was the alleged unfair labor practice at the premises where the conditions complained of arose: Styles v. Local 760, etc., D.C.E.D.Tenn. 1948, 80 F.Supp. 119; Cranefield v. Bricklayers, etc., D.C.W.D.Mich.1948, 78 F. Supp. 611; Brown v. Oil Workers International Union, D.C.N.D.Cal.1948, 80 F. Supp. 708; Douds v. Confectionery & Tobacco Jobbers Employees Union, D.C.S.D. N.Y.1949, 85 F.Supp. 191. Compare, however, Shore v. Building & Construction Trades Council, supra; Labor Board v. Local 74, United Brotherhood of Carpenters, etc., supra, and International Brotherhood of Electrical Workers v. Labor Board, 2 Cir., 1950, 181 F.2d 34. In the latter a divided court held that picketing the carpenters on a house-construction job in an effort to force them to force the contractor to get rid of a non-union electrical subcontractor was prohibited secondary action under § 8(b) (4) (A). The placard of the picket read: "This job is unfair to organized labor". The case is not unlike the present; but in reaching its conclusion the majority treated the carpenters and the principal contractor, on the latter of whom the pressure was exerted through the carpenters, as third party neutrals who had no concern in the dispute with the electrical subcontractor. Judge Clark could not accept this separation of the parties. In his dissent he said in part:

"* * * The doctrine of enmeshed employment, applied by the Board and dis-

tinguished away in the opinion, presents perhaps the greatest anomaly of all. Thus picketing directed against a main employer remains still primary even though it may include special picketing directed intentionally against a subcontractor on the ground of the main employer. Ryan Construction Corp., 85 N.L.R.B. No. 76; Pure Oil Company, 84 N.L.R.B. No. 38. If these cases are sound—and it is believed they are within the intent and purpose of the Act—then it would seem that at least equally picketing against a subcontractor which reaches the main contractor as a part thereof would be permissible. And a fortiori should this be so the more closely the main contractor can be held a causative factor in the non-union employer's activities. * * *" 181 F.2d at page 41.

The trial examiner of the Board, following a lengthy discussion of the subject, in Denver Building and Construction Trades Council and William G. Churches, June 22, 1950, 90 N.L.R.B. No. 66, held action like that here involved to be primary and therefore not within § 8(b) (4) (A). The Board declined to assume jurisdiction in the case and therefore did not pass upon the unfair labor practice. To the contrary is the report in United Association of Journeymen etc. and Pettus-Banister Co., June 24, 1950, 90 N.L.R.B. No. 80, in which the Board also declined jurisdiction because of the essentially local character of the business done.

In Douds v. Metropolitan Federation of Architects, etc., supra, there was a strike against an engineering firm called Ebasco. After the strike began, Ebasco transferred a large part of its remaining work and employees to another engineering firm called Project, which had previously done subcontracting work for Ebasco. Project was thereupon picketed. Holding the picketing not to be secondary action, the court said the term "doing business" was to be read "with the aid of the glossary provided by the law of secondary boycott", continuing:

" * * * To suggest that Project had no interest in the dispute between Ebasco and its employees is to look at the form and remain blind to substance. In every meaningful sense it had made itself party

to the contest. Manifestly it was not an innocent bystander, nor a neutral. It was firmly allied to Ebasco and it was its conduct as ally of Ebasco which directly provoked the union's action.

\* \* \* \* \* \*

" * * * In encouraging a strike at Project the union was not extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it. See Bakery Drivers Local v. Wohl, 1942, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; cf. Carpenters Union v. Ritter's Cafe, 1942, 315 U. S. 722, 62 S.Ct. 807, 86 L.Ed. 1143." 75 F. Supp. at pages 676, 677.

That was a clearer case of primary action than the one with which we are concerned; but the reasoning is here applicable. Doose & Lintner was not neutral. It brought Gould & Preisner with the non-union labor onto the job. This brought the Council and Doose & Lintner into direct controversy. The picketing was designed to change the situation by bringing about the employment only of union labor on the Bannock Street job. There was no geographical separation at that location between Doose & Lintner and Gould & Preisner. Only by ceasing to work for Doose & Lintner could petitioners' members avoid working with Gould & Preisner's non-union men. Petitioners did not say to Doose & Lintner, in effect, "We will not work for you if you do business with Gould & Preisner". They said, in effect, "We will not work with non-union men, and therefore we will not work for you at the place to which you bring Gould & Preisner with non-union men". We think this action of petitioners was of a primary character even if petitioners envisaged it might result in a cessation of work on the particular job by Gould & Preisner. See United Electrical, Radio and Machine Workers, etc., and Ryan Construction Corporation, and Oil Workers International Union and The Pure Oil Company, supra. Clearer language than that of § 8(b) (4) (A) would be needed to take the conduct outside the provisions of § 13 that nothing in the Act shall be construed to interfere with the right to strike

"except as specifically provided for herein". We do not read the Act as specifically providing against a strike based upon labor conditions at the struck premises brought about by the activities of the principal contractor as well as of the subcontractor. If the picketing was directed against Gould & Preisner it was primary as to it. Its effect on others at the job would not change its character. If it was aimed at Doose & Lintner through the employees of other subcontractors or through their own employees it was aimed at conditions at the site of the picketing for which that firm was at least in part responsible. This also would be primary action. We think in fact the picketing must be considered as against both Doose & Lintner and Gould & Preisner—inseparably; and that its object was to bring the job to a standstill until the non-union electricians were replaced. The job was said to be "unfair". The contractor cannot separate itself from the conditions there so as to make the action by the Council against it secondary; nor can the subcontractor.

"* * * In view of the Congressional History of the Act, and the debates in the Senate, it would seem that the relationship between a principal and a subcontractor arising out of the awarding of a subcontract would not within the meaning of the Act be 'doing business' as between the parties. If that were true, it could easily result in a subterfuge and would enable a principal contractor, whose relations with labor and with employees were unfavorable, to hide behind a more favorable relationship of a sub-contractor. * * *" Mills v. United Association of Journeymen and Apprentices of Plumbing, etc., D.C.W.D.Mo. 1949, 83 F.Supp. 240, 245.

The converse is also true. To require the contractor to cease the interwoven activities that the close relationship between it and the subcontractor involves, leaving it free to buy goods from the subcontractor, sell to it, and employ it in other locations, is not to require the contractor to cease doing business with the subcontractor.

We do not, because the Board did not, pass upon any possible violation of other provisions of the Act. Convinced that the action in the circumstances of this case is primary and not secondary we are obliged to refuse to enforce the order based on § 8(b) (4) (A).

Other questions raised, in view of the foregoing, are unnecessary to be decided. For the reasons stated the order should be set aside, and

It is so ordered.

CLARK, Circuit Judge (dissenting in part and concurring in part and in the result).

I regret that I am unable to concur in the able and painstaking opinion of my colleague, Judge Fahy. I do concur in part III and in the result. I find myself completely unable to concur in parts I and II.

I do not believe that on the face of Judge Fahy's excellent statement of the facts, which need not be repeated, any showing whatever appears of interstate commerce in this case. Indeed, quite the contrary appears. It is conceivable that a building operation might be affected in some degree in interstate commerce but this would be most unusual. The operation described by the majority is characteristically an intrastate transaction. Therefore, the National Labor Relations Board had no jurisdiction. Indeed Congress would have no power to confer such jurisdiction.

As to part II, I am of the opinion that the action of the United States District Court in Denver rendered the matter *res judicata*. It was a court of competent jurisdiction—indeed the jurisdiction is expressly conferred by the statute. The issues were identically the same. The action of the court was directly adverse to the contentions of the Board. No appeal was taken.

For these reasons, I cannot concur in parts I and II but I do concur in part III and in the result.