John J. CUNEO, Regional Director of the Twenty-second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

LOCAL 472, INTERNATIONAL HOD CARRIERS' BUILDING AND COMMON LABORERS' UNION OF AMERICA, AFL–CIO; Local 147, Compressed & Free Air, Foundations, Tunnels, Caissons, Subways, Cofferdams, Sewer Construction Workers of New York and New Jersey States and Vicinity, affiliated with International Hod Carriers, Building and Common Laborers' Union of America, AFL–CIO; Local 825, International Union of Operating Engineers AFL–CIO; and Local 11, International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO, Respondents.

Civ. No. 14–59.

United States District Court
D. New Jersey.
March 30, 1959.

Alvin Lieberman, Washington, D. C., for petitioner, William J. Davis, Newark, N. J., Charles B. Slaughter, Washington, D. C., of counsel.

Andrew F. Zazzali, Newark, N. J., for Locals 472 and 11.

Michael Breitkopf, Newark, N. J., for Local 825, John J. Mooney, of the New York Bar, of counsel.

FORMAN, Chief Judge.

This petition is filed by the Regional Director of the Twenty-second Region of the National Labor Relations Board, for and on behalf of that Board, pursuant to Section 10 (*l*) of the National Labor Relations Act.[1] Petitioner seeks a temporary injunction to restrain the commission of certain acts alleged to be violations of Section 8(b) (4) (D) of the Act,[2] pending the Board's adjudication of a dispute presently before it. That section provides that:

> "'(b) It shall be an unfair labor practice for a labor organization or its agents—
>
> \*　　\*　　\*
>
> "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods,

---

1. 29 U.S.C.A. § 160(*l*) (1952 ed.)

2. 29 U.S.C.A. § 158(b) (4) (D) (1952 ed.)

articles, materials, or commodities or to perform any services, where an object thereof is: * * *

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: *Provided,* That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter; * * * "

The petition names as respondents Local 472, International Hod Carriers' Building and Common Laborers' Union of America, AFL-CIO (hereinafter called Laborers); Local 147, Compressed Free Air, Foundations, Tunnels, Caissons, Subways, Cofferdams, Sewer Construction Workers of New York and New Jersey States and Vicinity affiliated with International Hod Carriers, Building and Common Laborers' Union of America, AFL-CIO (Sandhogs); Local 825, International Union of Operating Engineers AFL-CIO (Engineers); and Local 11, International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO (Iron Workers).

The alleged violations are picketing of the Ernest Renda Contracting Co., Inc., the charging employer, and its subcontractors, the D. J. O'Connor Construction Co. and Renda-Pillon Construction Co., Inc., at various job sites, all within New Jersey.

Local 147, the Sandhogs, did not file an answer to the petition, nor did it appear at the hearing, at which the evidence adduced was substantially as follows:

In April 1958 the Somerset-Raritan Sewerage Authority awarded a contract for the construction of an interceptor sewer to serve the Boroughs of Somerville and Raritan and the Township of Bridgewater, all located within New Jersey, to the Ernest Renda Contracting Co., Inc. That contract exceeds $800,000. Mr. E. Renda testified that he did over $550,000 and $438,000 worth of business outside of New Jersey in 1958 and 1959 respectively and that in 1959 $100,000 worth of material came from outside this state for use on New Jersey jobs. He subcontracted the tunnel work to the D. J. O'Connor Construction Co. and the meter and siphon work to the Renda-Pillon Construction Co., Inc., and all other work was apparently reserved to the Renda Co.

In June 1958, the Renda Co. began its work. The following month Mr. E. Renda was visited at his offices in Bound Brook, New Jersey, by Mr. William A. Smith who represented the Engineers, accompanied by Mr. Lenny Massi of the Laborers, whom he testified he had happened to meet while on the way to see Mr. Renda. Mr. Smith testified that he told Mr. Renda that he "would like to organize his job" to which Mr. Renda replied, "When I want you fellows, I'll call you. Out." Mr. Renda testified that Messrs. Smith and Massi said that "They want to get me straightened out. You never going to get the job finished if you don't get the job straightened out." To these statements Mr. Renda stated that he replied, "We don't need men. I got enough men on the job." However the conversation ended, it was the last time that Mr. Renda saw either Mr. Smith or Mr. Massi.

Mr. Robert Wallace representing the Iron Workers called upon Mr. Renda prior to June 1958, according to his testimony, at the Raritan Disposal Plant, one of several job sites. Mr. Wallace stated that at that time he "asked Mr. Renda if he intended to do [the job] himself or let it out on subcontract * *

and left him his business card."[3] According to Mr. Renda this meeting took place in September 1958 and Mr. Wallace said, "You got some iron work in the meter chambers, you got some iron work, and I like to put some of my men." [sic]. In answer to this Mr. Renda stated according to his testimony that he did not know whether he was "going to do the job or subcontract it out."

On November 24, 1958, Mr. Wallace, accompanied by Mr. Larry Ventura of the Laborers Union met Mr. E. Renda at the Raritan Disposal Plant. At that meeting Mr. Wallace testified that he "talked * * * about soliciting [Mr. E. Renda's] men, to unionize them." Mr. Wallace further testified that Mr. Renda said that "he wasn't going to do it." Mr. Renda, however, testified that Mr. Ventura did all the talking and said "We'd like to see you get yourself straightened out in this job * * * We'd like to see some of my boys get to work. We've got a lot of men out of work now * * * Pickets off the job when you get yourself straightened out."

On the same day a conversation was held at the same site between Messrs. Wallace and Ventura and Mr. Oscar Renda of the Renda-Pillon Co., Inc. Mr. Wallace stated that he "talked to Mr. Oscar Renda about organizing the men on the job. He [Mr. Oscar Renda] said the job was too small, and he didn't want anything to do with the unions."

According to Mr. Oscar Renda, Mr. Ventura said "he would like to have us put some of his men to work, and I said, well, we only have three or four men working on this job. There is only myself and three more employees, that we wouldn't need anybody else. Then Mr. Wallace replied if we couldn't use a couple of his iron workers to tie the iron for us, and I also replied that it was such a small amount of iron that we didn't think we could use anybody. We could do it ourselves, and that was the whole course of the conversation, and they said goodbye, and they left."

Picketing began in mid-November at the tunnel site on Route 206 where the D. J. O'Connor Co. had begun its work in mid-October 1958. Initially, according to Mr. F. J. Fella, who is chief engineer for the Renda Co., the pickets represented only the Sandhogs, but within a few days both the Laborers and the Engineers had their representatives there as well. Mr. O'Connor and Mr. E. Renda corroborated this in their testimony, although a representative of the Laborers, Mr. Andrew J. Putek, testified that his union never picketed the O'Connor job. On November 24, according to Mr. Fella, all the respondents were picketing the sewage disposal plants in Somerville and Raritan at the junction of Route 7 and the Raritan River. Mr. Fella further testified that on January 3, 1959, picketing was being conducted in Hillsboro Township, about two miles from the Raritan River; on January 4, at the heliport in Somerville; on January 9, on the Old York Road; and on January 13, by the Laborers and Engineers at the home offices of the Renda Co. on Route 22 in Bound Brook, New Jersey. Mr. Fella did not assert who conducted the picketing on January 3, 4 and 9.

Mr. O. Renda testified that picketing was carried on at the Raritan Disposal Plant on November 24, 1958, by the Laborers and Iron Workers.

Mr. Wallace testified that the Iron Workers only picketed Renda-Pillon and specifically denied that that union had picketed the Renda Co.

Mr. Smith stated that the Engineers picketed the Renda Co. at the Raritan Disposal Plant on about November 25.

Again, according to Mr. Fella, the signs carried by the pickets bore the legend, "E. Renda Unfair to Local [as applicable] CIO, AFofL," "E. Renda and O. Renda Unfair," and "Renda-Pillon Unfair."

Picketing at one or more places has gone on up to and including the date of the hearing herein but it has been peaceful and, except for some name call-

3. Petitioner's Exhibit 1.

ing, without event. Saving the D. J. O'Connor Co., no employees have resigned or quit their jobs. And in that case the employees were members of the Sandhogs which union did not appear at the hearing as noted earlier.

Prior to the picketing all material was delivered by the suppliers. Since the picketing, however, the drivers of American-Marietta Company, a supplier of pipe, and the concrete supplier, not otherwise identified, have refused to cross the line. As a result the Renda Co. purchased a truck for use in procuring concrete. It has also had to pick up pipe supplies at the plant of the American-Marietta Company.

Petitioner contends that he has reasonable grounds to believe that the respondents have acted in concert to effect the assignment of "the construction work on the Somerset-Raritan sewer to employees who were members of or represented by the respondents, rather than to employees who were not members of or represented by respondents," which activities the petitioner alleges are violative of Section 8(b) (4) (D) of the Act. The bases for his contention are that the respondents have (1) resorted to picketing and other coercive means, (2) engaged in dual visits upon Ernest and Oscar Renda as noted earlier in which threats were implied, (3) caused employees of suppliers to refuse to deliver materials to the Renda Co. and (4) caused two union employees of the subcontractor O'Connor to abandon their work.

Petitioner has cited an abundance of cases to support his proposition that picketing is an inducement, the legality of which is not determined by its effectiveness; and that picketing is illegal if merely one of its objectives, as distinguished from its primary objective, is proscribed. With the exception of National Labor Relations Board v. John Engelhorn & Sons, 3 Cir., 1943, 134 F.2d 553, concerned with the unfair labor practice of an employer, these cases all involve secondary boycotts, a factor admittedly not present in this case.[4] While there is no argument with the authority of these cases, their applicability to the facts of this case is to be questioned. The crux of the legality of the picketing depends upon that which it seeks to induce, for only if one of its objects, primary or secondary, is proscribed, does it become illegal. As the United States Supreme Court said in Garner v. Teamsters, Chauffeurs and Helpers Local Union, 1953, 346 U.S. 485, 499, 74 S.Ct. 161, 170, 98 L.Ed. 228:

"The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of the national Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing. * * *".

Thus the object of this picketing must be examined.

Petitioner argues that the picketing was intended to induce or encourage the employees of the charging employer and its subcontractors to strike or otherwise to impede their employers' work. Respondents, on the other hand, maintain that the picketing was for organizational purposes only. Some of the charging employer's testimony would seem to support this representation. Indeed Petitioner's Exhibit 3, a letter sent to the American-Marietta Company on January 9, 1959, and signed Ernest Renda, per F. J. Fella, contains the following quotation: "Our organization has been beset by pickets in an attempt to force us into unionization." Petitioner is not of course bound by the conclusions of E. Renda as to the purpose and legality of the picketing in issue. Nevertheless,

such a statement does show what the understanding was between respondents and the Renda Co., and to that extent bears upon the main issue.

Further, no employees, save two members of the Sandhogs who were employed by the D. J. O'Connor Co. have quit work. Cross-examination of the labor representatives revealed that no employee had been followed to his home, invited to attend a union meeting, or been sent literature. Mr. Putek, a representative of the Laborers, testified that "I have contacted some of the men that work for Ernest Renda. In fact, there is some that come to the picket line and asked the pickets 'Tell the delegates or business representative to get in touch with us.'" Mr. Putek further testified that four employees of the E. Renda Co. who sought information from the pickets have been signed up and in addition that he had the names of several other prospects. This is the full extent of any respondents' contact with the employees, with the exception of the Sandhogs as hereafter set out.

Petitioner cites the following quotation from Gemsco, Inc., 111 NLRB 82, 88, reversed on other grounds sub nom. Bonnaz, Hand Embroiderers, etc. v. National Labor Relations Board, 1956, 97 U.S.App. D.C. 234, 230 F.2d 47:

"Though in form the picket signs simply appealed to company employees to join the Union, and though there is no independent evidence that company employees were otherwise specifically requested to engage in a strike or a concerted refusal to work, established Board authority nevertheless requires the conclusion that the picketing itself constituted an inducement or encouragement to the employees of the Company to engage in a strike or other concerted refusal to perform services for their employer. See International Brotherhood of Teamsters, etc. (Union Chevrolet Company), 96 NLRB 957; Brewery and Beverage Drivers, etc. (Washington Coca Cola Bottling Works, Inc.), 107 NLRB 299. In the words of the Board in the Coca Cola case, the 'broad argument that picketing * * * is aimed only at publicizing a labor dispute and not at inducing work stoppage by employees who are required in their regular employment to cross the picket line, has been too often rejected to require further elaboration here.'"

But, in Douds v. Local 50, etc., D.C. S.D.N.Y.1955, 127 F.Supp. 534, affirmed 2 Cir., 1955, 224 F.2d 49, 51, petitioner, for the Board, sought an injunction restraining the respondent non-certified union from picketing the plant of the Arnold Bakers, Inc. In that case an independent union had already been certified by the Board. Respondents, however, maintained two pickets whose signs urged the public not to buy Arnold's products because its employees refused to join Local 50. Neither strike nor slowdown occurred; nor did anyone refuse to cross the picket line or to use or transport Arnold's products. Undoubtedly, the ultimate object of the picketing was to effect the recognition of Local 50 as the bargaining representative of the Arnold employees, however remote that prospect may have appeared in view of the prior certification of another union. The district court refused to issue the injunction, holding that the testimony failed to support the contention that the mere presence of pickets outside the plant of Arnold Bakers, Inc. is an act designed to "induce or encourage the employees of any employer to engage in, a strike or concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services".[5]

On appeal petitioner made essentially the same argument as that quoted from the Gemsco case. In affirming the lower court's decision, Judge Swan concluded

5. Douds v. Local 50, etc., 2 Cir., 1955, 224 F.2d 49, 50.

that this argument "might be persuasive if the picketing had had any consequence. [However] It did not." And further, "If the appellee [the union] is to be 'presumed' to intend the consequences which follow from its conduct, the inference to be drawn is that Local 50 did *not* intend to influence the employees of Arnold to cease work."

Applying Judge Swan's rationale to the facts of this case I come perforce to the same conclusion. I see no reasonable grounds for petitioner to believe that the picketing in this case had for a purpose an objective proscribed by the Act.

Petitioner points to the joint visits by Messrs. Smith and Massi, representing the Engineers and the Laborers, *on one occasion*, and by Messrs. Wallace and Ventura, representing the Iron Workers and Laborers, *on another*, as evidence of the concert of action existing among the respondents to force allocation of work to their members. Since these visits were not participated in by the Sandhogs, the most they gave rise to is a concert of activity among the Laborers, Engineers and Iron Workers, the purpose or objective of which must still be determined, for mere concert of action does not without more imbue otherwise legal acts with illegality.

Petitioner cites Local 450, International Union of Operating Engineers, etc. v. Elliott, 5 Cir., 1958, 256 F.2d 630, and International Longshoremen's, etc. v. Juneau Spruce Corp., 9 Cir., 1951, 189 F.2d 177, in support of his argument. Both cases are distinctly different factually from the case at bar. In Local 450, the subcontractor, Sline, was using his own employees who were members of another union. Local 450 sought the assignment of that work to its own members, thereby violating Section 8(b) (4) (D) of the Act. The Juneau case was one for damages and in that case the defendant union was seeking work already being done by members of another union certified by the Board.

In this case the unions understandably desire to organize the non-union employees of the charging employer and its subcontractors and thus gain recognition. To attain this they resorted to the traditional tool of the union, the picket line. Section 8(b) (4) (D) makes it an unfair labor practice for a union to force or require, "any employer to assign particular work to employees in a particular labor organization * * * rather than to employees in another labor organization * * * unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work." There is no such failure to conform here. Nor are the respondents forcing or requiring the employers to assign work to them rather than to another or other unions, for these employees belong to no union at all. To interpret Section 8(b) (4) (D) to mean that it shall be an unfair labor practice for a union to seek the assignment of work then being done by non-union personnel is to stretch unduly its clear meaning. On its face 8(b) (4) (D) proscribes only those situations in which one union seeks the assignment of work then being performed by another union or labor organization. Indeed, the cases cited by petitioner involve exactly that factual situation.

As noted heretofore, the drivers of certain suppliers refused to cross the picket line. While there is evidence that a representative of the American-Marietta Company stated that pipe could not be loaded on the Renda trucks because, "Ventura's [6] people are our people. We have a contract coming up in a couple of months * * * and we don't want to get caught in the middle of this," the fact is that the pipe was loaded. There is no evidence that this hesitation or reluctance was born of anything but caution on the part of the American-Marietta management.

Where employees of neutral employers, here suppliers, independently de-

---

6. Representative of the Laborers Union.

termine not to cross a union picket line, the picketing is not thereby rendered illegal, and in the absence of something more, there is no reasonable cause to find concerted action among the pickets and the employees who refuse to cross the line, nor does the Act provide otherwise. The Act does proscribe the acting in concert of one union with the employees of another so as to influence the secondary employer's dealings with the charging or primary employer. But there is no indication of that in this case.

In National Labor Relations Board v. International Rice Milling Co., 1951, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, the union, not certified, picketed Rice Milling Co. in the hope of securing recognition as the collective bargaining agent of the mill employees who were non-union. The Board dismissed the company's complaint; the Circuit Court reversed.[7] The Supreme Court, however, reinstated the Board's decision based on the following facts. During the picketing two employees of a neutral employer were encouraged not to drive their truck to the mill for an order of goods in the course of their employment.[8] The goal of the picketing was recognition of the union. But no employee participated therein. The Court assumed without deciding that this conduct was calculated to force the neutral employer to stop doing business with the charging employer and to pressure the latter into recognizing the union. The Court held that the stopping of the truck did not amount to the concerted activity proscribed by the Act [8 (b) (4) (D)]. There, as here, there was no attempt by the union to induce any action more widespread than that described, and no inducements were applied except at the picket line. The Court

said, 341 U.S. at page 671, 71 S.Ct. at page 964:

"A union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees. Generally, therefore, such actions do not come within the proscription of § 8(b) (4), and they do not here."

So, too, in the case at bar, and in the absence of additional factors, no injunction will issue because of the refusal of neutral employers' employees to cross the line, as related heretofore.

Nor is a distinction to be drawn here between Douds v. Local 50, supra, and the instant case based on the failure of the suppliers' drivers herein to cross the picket line. Under the Rice Milling case, supra, an independent voluntary decision not to cross the line is not, in the absence of something more, the concerted activity condemned by the Act.

Hence, I cannot say that the refusal of the suppliers' drivers to cross the picket line in this case constitutes reasonable grounds for the petitioner to find the illegal concert of action proscribed by the Act.

Mr. D. J. O'Connor testified that two of his nine employees were members of the Sandhogs union, of which he himself had been a member for about 23 years until December 1958 when his membership was terminated. He testified further that Mr. McCann, a New York Business Agent of Local 147 of the Sandhogs in New York, in company with Mr. Boyce, Business Agent of Local 147 in New Jersey, and a Mr. McDonald,

7. International Rice Milling Co. v. National Labor Relations Board, 5 Cir., 1950, 183 F.2d 21.

8. The Court found that the pickets had thrown stones at the truck but said, 341 U.S. at page 672, 71 S.Ct. at page 964, "In the instant case the violence on the picket line is not material. The com-

plaint was not based upon that violence, as such. * * * The substitution of violent coercion in place of peaceful persuasion would not in itself bring the complained-of-conduct into conflict with § 8 (b) (4). It is the object of union encouragement that is proscribed by that section, rather than the means adopted to make it felt."

called upon him on November 6, 1958 and said that he "wanted all [Local] 147 men there, that he had a lot of men that wasn't working." Mr. O'Connor testified that he "said it was a non-union job * * * and it is going to be done as non-union, but I will hire union men if they come along." To this, testified Mr. O'Connor, Mr. McCann said, "* * * he would be back the next day with men and throw the compressor over the side." Thereafter, according to Mr. O'Connor, Mr. McCann "talked to the superintendent which is O'Keefe, and Mike Turkely," both members of the Sandhogs, whereupon Messrs. O'Keefe and Turkely left their jobs to which they have never returned. Mr. O'Connor testified that during the visit by Messrs. McCann, Boyce and McDonald "there must have been around 50 men altogether" present, a few of whom he recognized as members of Local 147. He said that they "just stirred around." When the union workers left the job, it was necessary for Mr. O'Connor to substitute his night shift for them and to hire new workers for that shift.

Assuming the illegality of this conduct by the Sandhogs, there is no evidence before me which provides reasonable basis for petitioner to believe that the other respondents had agreed thereto. I am not unmindful of the evidence indicating contemporaneous presence of the representatives of the Sandhogs and the other respondents on the picket line. But contemporaneous presence on the picket line standing alone is not sufficient basis from which an agreement to participate in the other activities of the Sandhogs may reasonably be found by petitioner, especially in view of the conduct of the other respondents.

At the hearing, a motion by respondents present to strike that testimony relating to the activities of the Sandhogs as not binding upon them was reserved. In view of petitioner's failure to adduce any evidence that would tend to establish such a connection between that respondent and the other three who appeared, that motion will now be granted.

 A union may peacefully picket an employer for recognition with impunity.[9] And this it may do after and in spite of the prior certification of another union.[10] That being so, and in the absence of any evidence that the picketing in this case produced or tended to produce any of the results condemned by 8(b) (4) (D), no injunction will issue. Granting that petitioner need only demonstrate reasonable grounds to believe his allegations to be true in order to obtain the relief he seeks, something beyond a bare assertion is required in reaching even this minimal standard.[11] On the evidence in this case I cannot find that the petitioner has reasonable cause to believe that Section 8(b) (4) (D) of the Act has been violated. Accordingly the petition will be denied and an order should be presented.

---

9. Current legislation (S. 748, introduced by Senator Goldwater, Vol. 105 Cong. Rec. No. 15 p. 1160) is before the Congress, the effect of which, if passed, would be to outlaw picketing such as found in the instant case, absent the fulfillment of certain proposed requirements, e.g., a showing that the union represents "sufficient interest on the part of the employees."

10. Douds v. Local 50, etc., 2 Cir., 1955, 224 F.2d 49; Douds v. Knit Goods Workers' Union, D.C.E.D.N.Y.1957, 147 F.Supp. 345; D.C.E.D.N.Y.1957, 148 F. Supp. 615.

11. Alpert v. Truck Drivers, Warehousemen and Helpers, D.C.N.D.Me.1958, 161 F.Supp. 86, 89.