John A. HULL, Jr., Regional Director of the Eighth Region of the National Labor Relations Board, for. and on behalf of the National Labor Relations Board, Petitioner,

v.

AMERICAN WIRE WEAVERS' PROTECTIVE ASSOCIATION, AFL-CIO, and Ohio Division No. 2, American Wire Weavers' Protective Association, AFL-CIO, Respondents.

Civ. A. 34079.

United States District Court
N. D. Ohio, E. D.
Dec. 30, 1957.

W. K. Griesbach and Walter M. Moldawer, Cleveland, Ohio, for plaintiff.

Jack G. Day, Cleveland, Ohio, for defendants.

McNAMEE, District Judge.

In this proceeding, brought under favor of Section 160(*l*) of Title 29 U.S. C.A., petitioner prays for a temporary injunction restraining respondents from committing the alleged unfair practices described in the petition, pending final determination of the charges by the National Labor Relations Board.

This court has discretion to grant or withhold the relief requested, although it may not refuse such relief if the petitioner has shown reasonable cause to believe that the charges of unfair practices are true.

Simply stated, it is the petitioner's claim that respondents have engaged in a strike at the Cleveland plant of the Lindsay Wire Weaving Company and have been and are picketing both the Cleveland and Mentor, Ohio plants of the company with the object of forcing and requiring the company to assign "weavers' work" at its plant at Mentor, Ohio to weavers and apprentices, members of respondents'. union rather than to unskilled loom operators, in violation of Section 8(b) (4) (D), Title 29 U.S. C.A. § 158(b) (4) (D).

The salient facts and events preceding and constituting the alleged unfair practices as disclosed at the hearing, are:

For many years the Lindsay Wire Weaving Company has been engaged in the manufacture of Fourdrinier wire cloth at its plant in Aspinwall Avenue, Cleveland, Ohio. Since 1920 all of its weaving has been done by members of the Ohio Division No. 2 of the American Wire Weavers' Protective Association pursuant to collective bargaining agreements periodically entered into by the company and the union.

In June, 1955 the company commenced the construction of a new plant at Mentor, Ohio, 25 miles east of its Aspinwall plant, for the purpose of manufacturing wire cloth. In November, 1955 the Executive Board of the national union, which is composed of representatives of the local unions throughout the country, including a representative from Division No. 2, received a proposal from the officers of the National Employers' Association suggesting consideration by the union of changes in future contracts relative to the classification of workers and rates of pay. In May, 1956 Lindsay informed local union representatives that the company intended to assign the operation of its looms at Mentor, Ohio to loom operators rather than to weavers and apprentices. In the summer of 1956 the union served notice on Lindsay of its intention to terminate the 1954 collective bargaining agreement upon its expiration on September 21, 1956. Thereafter, on September 14, 1956, and in order to avoid a strike, the company orally agreed to transfer weavers and appren-

tices from its Aspinwall plant to Mentor, when operations commenced at the latter plant and to continue in effect the provisions of the 1954 contract pending the execution of superseding agreements between the parties. At this time the general counsel for the national union promised the company that it would receive future concessions equivalent to concessions made by the union to the Appleton Company of Wisconsin and Montgomery, Alabama, with which company the union was then attempting to negotiate a contract. On December 13, 1956 the oral agreement of September 14, 1956 was reduced to writing. In this written statement Lindsay agreed to recognize the weavers' trade and to transfer union personnel from Aspinwall to Mentor pending the execution of new collective bargaining agreements. Accordingly, when operations commenced at Mentor, union members were transferred from Aspinwall to weave the wire cloth being manufactured at Mentor. In January, 1957 the union, being unable to conclude a satisfactory agreement with Appleton, called a strike at that company's plant. The union lost that strike. On July 22, 1957 the Lindsay Company sent a notice to the union advising that because of the latter's failure to grant concessions comparable to those enjoyed by Appleton, Lindsay proposed to adopt a new policy at Mentor on September 23, 1957, which would provide:

1. Different rates for new and larger looms which will be placed into production.

2. A new classification for men running looms.

3. The removal of all restrictions on experimental work.

4. Some departures from the present rules governing weavers' work.

5. The continuance of a temporary setup pending a full contract.

On September 9, 10 and 11, the parties met, together with representatives of other wire weaving companies and the National Executive Board of the union in an effort to arrive at collective bargaining agreements. On September 11, 1957 representatives of Lindsay restated to the general counsel of the union its purposes as expressed in its letter of July 22, 1957. The general counsel of the union thereupon stated that the union "would fight to its economic death" to prevent such a program from becoming effective. About a week later the Executive Board of the union notified all employers that further collective bargaining sessions would be held in New York on September 20, 1957. No representative of Lindsay appeared at this meeting. On September 21 the union called a strike. Immediately following the strike both the Cleveland and Mentor plants of the company were picketed and the picketing has continued to the present time. Lindsay's failure to send a representative to the meeting of September 20 was explained in a letter to the President of the union, which, however, was not received by him until after the strike was called. From the time of the oral agreement in September, 1956 until September 21, 1957 all of the weaving of wire cloth at the Mentor plant was done by members of the union who were temporarily transferred from Aspinwall. At the time of the strike, eight Aspinwall weavers were employed at Mentor, and according to the notice on the bulletin board of that plant, they were scheduled to continue working there during the week following the strike. It was not until after the strike was called that any one other than members of the respondents' union performed any weaving work at Mentor. It is clear that the parties were unable to consummate a new collective bargaining agreement because of the insistence of the union on one contract for both the Cleveland and Mentor operations which would provide for the same terms and conditions of employment at each plant, and the company's inflexible stand that separate and different agreements for each plant be consummated. The company consistently expressed its willingness to protect fully the rights of the union members employed at Aspinwall, and sought only to obtain concessions in re-

spect of its operations at Mentor. The union viewed the company's proposal to classify its employees at Mentor as loom operators, etc., who would receive less wages for performing the same work as weavers, as a threat to its continued existence and as a portent of serious economic detriment to its members. According to F. L. Crossman, President of Lindsay, the work of weaving wire cloth involves eight separate operations, all of which are performed at Aspinwall by the same journeymen weavers and apprentices. These operations are: (1) winding-on the loom; (2) threading-in operation; (3) setting the looms; (4) starting the wire cloth; (5) timing and adjusting the loom; (6) weaving; (7) repairing weaving defects; and (8) the cutting-out operation. The first five operations are preparatory to the principal operation of weaving. Loom operators require two to four weeks training, and this work has been assigned at Mentor to unskilled workers at that plant. The winding-on and threading-in operations can be done properly only after 4–6 weeks training. This work has been assigned to "winding-on" men. The setting, starting, and timing operations require much greater skill, which can be acquired only after one-two years training. The company has established a class of workmen designated as "set-up" men to perform this work at Mentor. Thus, since the strike the company has created and established three new classes of workmen at Mentor and has trained or is now training such men to perform parts of the work customarily done by journeymen weavers and apprentices.

Section 158(b) (4) (D) of Title 29 U.S.C. provides as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike \* \* \* where an object thereof is:

\* \* \* \* \*

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:"

This section is designed primarily to prevent stoppages of work caused by jurisdictional disputes between competing employees in a labor union or in a particular trade, craft, or class, on the one hand, and employees in another labor union, trade, craft, or class, on the other. The proscriptive terms of the section are not limited to work assignment disputes between employees of competing labor organizations. They include as well disputes between employees of a labor organization and employees of a trade, craft, or class, whether organized or not. The section is designed to protect employers as well as employees.

The respondents contend:

"The only issue in this case is whether employees striking to preserve recognition already extended and to achieve terms and conditions is converted into a jurisdictional dispute which can be enjoined because the employer has, or claims to have, or threatens to hire replacements after the strike has begun."

The foregoing may not be an entirely accurate statement of the real point of the controversy, but it comes close to the heart of the matter and serves to illustrate the unique character of the dispute in relation to the section under favor of which the charges are brought. In a real sense, a strike for recognition involves an attempt by the striking union to compel an employer to assign work to its members rather than to others. But not all such strikes are within the ban of Section 8(b) (4) (D). The unusual nature of this dispute is further exempli-

fied by the fact that employees of the accused labor organizations have been employed continuously for more than thirty-six years by the employer to perform the same work which the employer proposes to classify and assign to others at lower wages. There can be little doubt that the union and its members will be adversely affected if the employer succeeds in achieving its objective. It puts no strain on the imagination to envision the damaging effects of the success of the company's plan at Mentor, upon the members of the union at the Aspinwall plant. The probable adverse effect on the continuity of employment at the Cleveland plant is at once apparent. It is reasonably to be expected that in slack times the lay-offs in the Cleveland plant, with its higher wage rate, would be more frequent than in the more cheaply operated plant at Mentor. Nor is it mere speculation to suggest that if the company's plans for Mentor are successful, other wire weaving companies throughout the country will put similar programs into effect. The November, 1955 proposal of the Employers Association is a clear indication that such action would be taken. Although Lindsay is committed in good faith to maintain the union scale of wages and a standard of working conditions at Aspinwall acceptable to the union, this affords no protection against the weakening of the union's bargaining strength and the lowering of wage standards in the weavers' trade that would seem inevitably to follow the establishment of new classifications of workers at Mentor. The membership of Local No. 2 is about 130. The entire membership of the American Wire Weavers Protective Association in the country is a little more than 500. It is a small organization, but its members are no less entitled to take concerted action for their mutual aid and protection than are the members of larger and more powerful labor organizations.

Another differentiating aspect of this dispute is the fact that the strike was preceded by extended negotiations between the employer and employee, including a temporary arrangement under which the members of the union worked at Mentor. Collective bargaining sessions between the parties were continued after the strike was called. This is not the usual pattern of cases arising under Section 8(b) (4) (D). It is true that the union now has no contract covering the work at Aspinwall. Nor does it have any enforcible rights accruing under the temporary agreement of December 13, 1956. However, it is seriously to be doubted that these facts disqualify it from exerting the pressure of a strike to enforce its demands for recognition and to preserve the economic gains achieved after long years of struggle.

The petitioner takes the view that the motivating factor of the strike is to coerce the employer to capitulate to the demands for the work assignment which is proscribed by Section 8(b) (4) (D). He argues in the alternative "that even if respondents' strike was to enforce legal demands as well as for the proscribed object, it would not constitute a defense. To the contrary, it is sufficient under the Act that only one of the objects is the object proscribed by Section 8(b) (4) N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 688–689 [71 S.Ct. 943, 95 L.Ed. 1284]; International Bro. of Electrical Workers v. N. L. R. B., 341 U.S. 694 [71 S.Ct. 954, 95 L.Ed. 1299]."

The petitioner is right in asserting that a labor organization gains no immunity from a charge of unfair labor practice by combining legitimate objects of a strike with an object that is unlawful. This argument is supported by the plain terms of the statute and the controlling precedents cited above. But the petitioner's claim that respondents are striking for an unlawful object is without either statutory or precedential sanction. It was the manifest intention of Congress in enacting the section to protect employees, employers, and the public against disruptions of work arising out of jurisdictional disputes over the assignment of work in progress, or about to be performed, by workmen capable of

performing it. The legislative purpose is expressed in words that are precise and explicit and, when read in context, seem clearly to exclude the strike here in question from the operation of the section.

■ It is a settled canon of construction that words used in one place in an enactment have the same meaning in every other place in the statute. 50 Am.Jur., sec. 271, p. 259. The unlawful object interdicted by Section 8(b) (4) (D) is defined in part as "* * * forcing or requiring any employer to assign particular work to employees in a particular *labor organization* or in a particular *trade, craft,* or *class* rather than to employees in another *labor organization* or in another *trade, craft,* or *class,* unless * * *"

■ The underscored words as they first appear in the section obviously refer to an established and existing labor organization, trade, craft, or class. As they appear again in the section these words have the same meaning. The word "employees" as initially used in the section necessarily refers to workmen who are members of one of the designated statutory units who are qualified by training and experience to perform the particular work in question. When the word "employees" is repeated in the section it has the same significance. As thus read, the statute is free from ambiguity and provides a fixed and permanent standard by which it can be ascertained whether a particular case is included within or excluded from the operation of the statute. 50 Am.Jur., p. 394, sec. 380.

■ That the strike of the respondents is excluded from the operation of the section would seem to be beyond question. At the time the strike was called, the respondent labor organizations were established and functioning. The weavers' trade had long been recognized as one of the skilled industrial crafts. The employees who are members of the union were qualified to perform the work of weaving wire. However, there was no trade or craft of "wind-on men",—"set-up men",—or "loom operators"—to whom the work could then be assigned. Nor was there in existence any class or "cognizable group" of employees at Mentor who possessed the requisite skill to perform the work. Under these circumstances the essential ingredients of a jurisdictional dispute were absent, and there could be no jurisdictional strike in the proper sense of that term.

Petitioner argues that although no employees at Mentor did any work in weaving wire before the strike, their participation in the work since that time constitutes a sufficient basis for holding the strike to be jurisdictional. I do not agree. Section 160(k) requires the Board to hear and determine the dispute "out of which such unfair labor practice shall have arisen." The dispute here was over the employer's proposal to establish new classifications of workers at Mentor at a lower wage scale. The fact that after the strike the employer hired and trained men and established new classifications does not operate to change the nature of the dispute that caused the strike. The members of the union struck for their mutual protection against the threat of serious economic harm implicit in the company's proposed change of policy. As I view it, the strike is not tainted with illegality.

Additional reasons might be advanced in support of this view, but enough has been stated to indicate that I am not persuaded that there is reasonable cause to believe that the charge against the respondents is true.

The petition is dismissed and the application for temporary injunctive relief denied, without prejudice to a further application in the event the Board holds the strike to be unlawful.