**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL UNION NO. 9, WOOD, WIRE & METAL LATHERS INTERNATIONAL UNION, AFL–CIO, Respondent.**

No. 7594.

United States Court of Appeals
Fourth Circuit.

Argued April 10, 1958.

Decided June 2, 1958.

Thomas J. McDermott, Associate Gen. Counsel, N.L.R.B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls and William J. Avrutis, Attys., N.L.R.B., Washington, D. C., on the brief), for petitioner.

Thomas X. Dunn, Washington, D. C. (Martin F. O'Donoghue and Patrick C. O'Donoghue, Washington, D. C., on the brief), for respondent.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and THOMSEN, District Judge.

HAYNSWORTH, Circuit Judge.

This case is brought here by the petition of the National Labor Relations Board to enforce its order in an unfair labor practice proceeding (117 N.L.R.B. 352), which was founded in part upon an earlier decision (113 N.L.R.B. 1237) in a proceeding under Section 10(k) of the National Labor Relations Act. 29 U.S.C.A. § 160. It arises out of a controversy over the assignment of certain work in the installation of acoustical tile to carpenters rather than to lathers.

Anning-Johnson Company, through its branch office in Alexandria, Virginia, is engaged in the performance of contracts for the installation of acoustical tile and other construction work in the area of metropolitan Washington. Through its membership in the Construction Contractors Council it was bound by a contract with the Carpenters District Council which obligated the parties, in the assignment of work, to abide by decisions and awards of the National Joint Board for the Settlement of Jurisdictional Disputes, Building and Construction Industry. Anning-Johnson had no contract with the Respondent here, Local Union No. 9, or any other affiliate, of Wood, Wire and Metal Lathers International Union. Nevertheless, consistent with the practice in the Washington area, Anning-Johnson, for years, had employed lathers to install certain backing materials used in some systems for the installation of acoustical tile. Generally, if the specifications called for gypsum lath as the backing material, lathers were employed to install it, but if wider sheathing or wallboard was to be used, carpenters were employed for the purpose; if the specifications called for a metal suspension system that could be erected before tile was affixed, lathers were employed to erect the suspension system, but if the system was of a type which could be erected only as the tile was affixed, carpenters did the work.

In April 1954, the Lathers entered into a contract with the Employing Plasterers Association, of which Anning-Johnson was not a member, providing that lathers must be employed in the performance of designated work, including the installation of certain backing materials and suspension systems for plaster and for acoustical materials. To what extent the Employing Plasterers Association was concerned with the installation of acoustical tile is not clear, but the issue came to the fore when, in June 1954, the Lathers asked the Acoustical Contractors Association, of which Anning-Johnson was a member, to sign a contract containing provisions similar to those in the

new contract with the Employing Plasterers.

A number of conferences were held in which representatives of the employers raised objections founded upon the apparent conflict between the contract proposed by the Lathers and the claims of the Carpenters under their contract with the Construction Contractors Council.[1] A meeting on June 15, 1954, ended with a suggestion that the controversy be submitted to arbitration. In discussing the Lathers' objections to work assignments on a particular job, Anning-Johnson, on an undetermined date that summer, also suggested that the controversy between the Lathers and the Carpenters be submitted to the Joint Board for decision. The Lathers did not pursue either suggestion.

The only difference between the Lathers and the Acoustical Contractors was the jurisdictional controversy. It was for that reason only that the Acoustical Contractors, and Anning-Johnson, had not signed the contract proposed by the Lathers.

On June 18, 1954, Anning-Johnson was actively engaged in the installation of acoustical tile at the Hill Road Pumping Station in Prince George's County, Maryland. The suspension system there was of a type which, under Anning-Johnson's established practice, was installed by lathers. Lathers were employed there for that purpose, and the assignment of work on that job accorded both with the claims of the Carpenters and the demands of the Lathers. Though there was, thus, no controversy about work assignments on the Pumping Station job, the Lathers, on June 18, refused to work on the stated ground that Anning-Johnson had not accepted the contract proposal of the Lathers. On the next workday, the 21st, carpenters having been assigned to the work, the Lathers had pickets on the job. Employees of other contractors refused to cross the picket line, and Anning-Johnson was forced to relinquish its contract.

A charge having been filed that the Lathers were engaged in an unfair labor practice within the meaning of § 8(b)(4)(D) of the Act (29 U.S.C.A. § 158),[2] an administrative hearing under § 10(k)[3] was held, after which the Board determined that Anning-Johnson's assignment of the disputed work was in accordance

1. Decisions of the Joint Board in March, July, November and December, 1954, awarded work in the disputed area to the Carpenters.

2. § 8(b). "It shall be an unfair labor practice for a labor organization or its agents—

     *    *    *    *    *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike, or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: * * * (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: *Provided*, That

nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter; * * *."

3. § 10(k) "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

with area practice and within the right of the employer, and, since the Lathers had not been certified to represent employees doing the work in dispute and had no contract right to enforce, their strike to compel a reassignment of the work was an unfair labor practice within the meaning of § 8(b)(4)(D).[4] The Lathers did not comply with the determination, and, in a subsequent proceeding under Section 10(c), the Board ordered the Lathers to cease and desist from its conduct which the Board found to be an unfair labor practice.

The Lathers' attack upon the order of the Board has two branches.

First, they say, the strike was to enforce their demand that the employer sign a contract expressing their position upon a bargainable issue. But the "bargainable issue" was their demand that the disputed work be assigned to them rather than, in accordance with current and prior practice, to the carpenters. The only disagreement arose out of the jurisdictional controversy between the Lathers and the Carpenters. Had Anning-Johnson acceded to the demands of the Lathers and aligned itself with them in their controversy with the Carpenters, it may have been confronted with a strike by the Carpenters, but it would have had no dispute with the Lathers and would have suffered no strike by them. The clear purpose of § 8(b)(4)(D) to eliminate jurisdictional strikes, except under certain conditions not present here, would be entirely circumvented if the protesting union was released from the prohibitions of that section upon the adoption of the simple expedient of incorporating in a contract proposal its position in the jurisdictional dispute. An effort to recast the controversy into a different form does not change its substance. As the Board said, the "insistent demand for specific contract provisions assigning such disputed work to the lathers rather than to the carpenters went to the very heart of this basic jurisdictional dispute." Indeed, it was merely the embodiment of their position in the jurisdictional controversy, and the Board was clearly warranted in concluding that the object of the strike was to force the employer to assign the disputed work to the Lathers.

Secondly, say the Lathers, there was no dispute about job assignments on the Pumping Station job where they called the strike; therefore, they reason, their contract demand must have been for the assignment of work *in futuro*, not for the reassignment of work then in existence. The distinction was drawn in District No. 9 International Association of Machinists (Anheuser-Busch, Inc.), 101 N.L.R.B. 346. Whatever may be said for the reasoning of the Board, under the particular circumstances of that case, however, it cannot fit the very dissimilar facts of the present case.

The demand of the Lathers was not that Anning-Johnson agree that it would assign to the Lathers work, in the future, should occasion arise, on the Pumping Station job. The demand was that Anning-Johnson, and all other members of the Acoustical Contractors Association, assign to the Lathers all work in the disputed area then existing, or thereafter arising. Their initial demand was upon the Association, not upon Anning-Johnson. The abortive negotiations were conducted largely by a committee of the Association, though individual contractors, including Anning-Johnson, were drawn into them. So clearly did the controversy embrace the whole industry that

---

4. The General Counsel for the Board urges upon us the legal sufficiency of the determination of the Board in the Section 10(k) proceeding, citing considerations and legislative history which seem to him to require a conclusion at variance with that of the Court of Appeals for the Third Circuit in N. L. R. B. v. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, etc., 3 Cir., 242 F.2d 722. The Lathers, however, disclaim the issue. Though they contest the conclusion of the Board upon other grounds, they do not contend that § 10(k) requires that the Board do more than it did here. Since the position of the General Counsel is not contested, we do not consider the question.

the Board, quite properly, did not limit its order to specified coercive action directed against Anning-Johnson, but expanded its order to cover similar pressures directed toward "any employer in the greater Washington, D. C., area" if brought to compel a reassignment of work in the field of dispute.

When the Lathers, in order to enforce their demand for the reassignment of the work, presently and in the future, opportunistically selected one job, where the work assignments were quite acceptable to them, as the place for the exertion of their power, they did not circumscribe their demand in time or in area. No one supposed that the strike at the Pumping Station could be settled by adjustments of work assignments at that job, for all agree there was no controversy there. Everyone knew that the strike at the Pumping Station could be settled by adjustments and agreements applicable to other jobs. When a union, in the construction industry, seeks to enforce its demands by a strike, it does not change the nature of the controversy if it elects to strike a job where it has no complaint rather than the job where it feels aggrieved. In either case, the pressure upon the employer is the same. Certainly the prohibitions of the Act, as applied in the construction industry where jurisdictional controversy had been particularly prevalent, would be rendered quite futile if it should be said that the jurisdictional battle may be waged without restraint so long as the assailing union selects a job upon which it has no grievance as the arena for the contest. There is no doubt of the nature of the controversy, or of its origin in, and its application to, work assignments under what was then present and established practice. Nor is all of this to be obscured because the Lathers determined to enforce capitulation to their demands at one place by the exertion of their full power at another.

The order of the Board will be enforced.

Order enforced.