Daniel P. **DOOLEY,** Acting Regional Director of Fourth Region of National Labor Relations Board, for and on behalf of National Labor Relations Board, Petitioner,

v.

**HIGHWAY TRUCKDRIVERS AND HELPERS, LOCAL 107, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,** Respondent.

**Civ. A. No. 2157.**

United States District Court
D. Delaware.

Feb. 26, 1960.

James T. Youngblood, Clifford M. Roth, Washington, D. C., and George Burnstein, Philadelphia, Pa., for Nat. Labor Relations Bd.

David Coxe, Jr., Wilmington, Del., Richard Markowitz, Philadelphia, Pa., for Local 107.

Daniel A. Lynch, of King & Lynch, New York City, for Safeway Stores, Inc.

**STEEL, District Judge.**

### Findings of Fact

1. The petitioner is Daniel P. Dooley, Acting Regional Director of the Fourth Region of the National Labor Relations Board (hereinafter "Board"), an agency of the United States. The respondent is Highway Truckdrivers and Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter "Local 107"). Petitioner seeks an injunction on behalf of the Board under Sec. 10($l$) of the Labor Management Relations Act, 1947, as amended [1] (hereinafter "Act"), to enjoin Local 107 from engaging in alleged unfair labor practices in violation of Sec. 8(b) (4) (D) [2] of the Act pending a final adjudication by the Board.

2. Local 107 is an unincorporated association in which employees participate.

1. 29 U.S.C.A. § 160($l$):

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 158(b) of this title * * * the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: * * * That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in pro-

moting or protecting the interests of employee members. * * * In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b) (4) (D) of this title."

2. 29 U.S.C.A. § 158(b) (4) (D):

"(b) It shall be an unfair labor practice for a labor organization or its agents—

*     *     *     *     *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

*     *     *     *     *

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:"

It exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. It is a labor organization within the meaning of Secs. 2 (5),[3] 8(b) and 10(*l*) of the Act. At all material times it has been engaged within this judicial district in transacting business and in promoting and protecting the interests of its employee members.

3. Safeway Stores, Inc., (hereinafter "Safeway") is engaged in the operation of a chain of retail grocery stores throughout the United States in connection with which it operates a meat processing plant at Wilmington, Delaware. In the operation of its business, Safeway annually receives and ships across state lines goods and materials valued at far in excess of $50,000.

4. For a number of years prior to the present controversy Local 107 had a collective bargaining agreement with Safeway for members of its union who, as employees of Safeway, drove Safeway trucks between its Wilmington plant and its distribution centers at Kearney, New Jersey and Landover, Maryland. In the latter part of 1959 three members of Local 107 were so employed by Safeway.

5. On October 16, 1959 Local 107 wrote Safeway and stated that it desired to terminate its bargaining agreement as of December 31, 1959, its termination date. It stated further that it desired to make certain changes in the agreement and would be glad to meet representatives of Safeway at such time as was convenient to them for the purpose of discussing the changes. Safeway replied by registered mail on December 11, 1959 and asked when and where the parties could get together.

6. On December 11, 14 and 23 Riethe, the manager of the Wilmington Safeway plant, telephoned the Wilmington office of Local 107 in an effort to discuss with its representative, Crawford, the contract changes which the union proposed. On each occasion Riethe was advised that Crawford was out; and on December 23 and on various other occasions Riethe left his name and asked that Crawford call him. He did not do so until December 31.

7. On December 28, Quinn, the staff negotiator of Safeway, informed the terminal managers of the Safeway distribution centers in Landover, Maryland and in Kearney, New Jersey that the trucking operation which theretofore had been carried on out of the Wilmington plant would no longer be conducted from Wilmington, but that the work was being re-assigned to Kearney and Landover. The distribution centers consisted of warehouses to which Safeway had its produce sent for distribution to its retail stores. On the same date Quinn spoke with Bell of Local 639 whose members were employed by Safeway at the Landover distribution center and with O'Connor of Local 660 which represented the employees of Safeway at the Kearney distribution center, and arranged with them to have members of their unions take care of the trucking between Landover and Kearney, respectively, and Wilmington. Locals 660 and 639 were chartered by the International Brotherhood of Teamsters just as was Local 107.

8. On December 28 Safeway wrote Local 107 and stated that the company had decided to discontinue its trucking operations as of January 1, 1960 and that it would attempt to find comparable work for the three union men in some other Safeway operation. The following day Safeway received from Local 107 a letter agreement which it requested that Safeway sign.

9. On the morning of December 31 Safeway terminated the employment of one of its three drivers who were mem-

---

3. 29 U.S.C.A. § 152(5):
   "(5) The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

bers of Local 107, and shortly thereafter the employment of the other two union drivers was terminated.

10. At noon on December 31, Crawford telephoned Riethe and asked Riethe what was going on at the plant. Crawford said that unless the company signed the demands of the union, it would have a picket line on the place at 12:01 that night. Crawford said that there would be no picketing if the company would sign the contract and put the three union employees back to work. The picketing began at 2:00 a. m. on January 2.

11. At a meeting on January 4, 1960 between representatives of Local 107 and Safeway, Crawford, speaking for Local 107, said that pickets were going to stay at the Wilmington plant until Safeway signed the agreement with the union, that the union was not interested in having Safeway trying to place its members elsewhere, and that they were going to stay in Wilmington and drive the Safeway equipment. Cohen, another union representative, said that the controversy could be settled by Safeway entering into a contract with Local 107 and continuing the employment of the three drivers whose services had been terminated.

12. During the period of the picketing a number of trucks approached the plant. When they came to the picket line the pickets stopped the trucks and talked to the drivers. The trucks were stopped in various ways, by the pickets calling to the drivers, waving their picket signs at them, or actually picketing in front of the pathway of the trucks. In each instance the truck refrained from driving into the plant and turned around and drove away.

13. Among other trucks to be picketed were those from Kearney and Landover which were driven by members of Locals 639 and 660. These trucks arrived at the Safeway plant in Wilming-

ton on January 3 and 4, respectively, to pick up meat to carry back to the distribution centers. The driver of the Landover truck was told by a picket, "You can't get any meat here today * * * We are picketing. * * * We are not letting anything in here." The driver then telephoned to the business agent of his Local in Washington and was told to return to Landover. He was told not to cross the picket line.

14. On January 6 a truck from Gulf Oil Company refused to make a delivery of oil to Safeway after pickets had talked to the driver for about five minutes. The Gulf Oil driver was a member of District 50 United Mine Workers. He was told by the picket, "You can cross if you want, but we would appreciate it if you would honor it."

15. On January 6 another truck with lubricating oil for Safeway was stopped by pickets and the driver refused to cross the picket line after he had been talked to by the pickets.

16. Between 8:00 a. m. and 4:00 p. m. from January 2 to January 9, inclusive, at least 19 motor vehicles which had been stopped and talked to by the pickets refused to enter the Safeway plant in Wilmington.

17. It is customery most of the time for members of one union to honor a request by members of another union not to cross a picket line.

18. The Board has not certified Local 107 as the bargaining representative of the employees of Safeway engaged in driving its trucks out of Landover, Maryland (Washington, D. C. area) or Kearney, New Jersey (New York metropolitan area), nor has the Board ordered Safeway to bargain with Local 107 on behalf of Safeway's employees.

19. On or about January 5, 1960, Safeway filed a charge with the Board under Sec. 10(k) [4] of the Act and alleged

---

4. 29 U.S.C.A. § 160(k):

"(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 158(b) of this

title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed,

that Local 107, in violation of Sec. 8(b) (4) (D), was engaging in a strike to compel Safeway to assign work to members of Local 107 rather than to the members of two other labor organizations. The charge was referred to petitioner as Acting Regional Director of the Fourth Region of the Board.

20. The present petition was filed on January 9, 1960. On the same day a temporary restraining order was issued which enjoined Local 107, until further order of the Court, from picketing the Safeway plant. The picketing ceased after the issuance of the restraining order. Since then, no truck has refused to enter the Wilmington plant.

21. As a result of the picketing 165 to 175 production and maintenance employees at the Wilmington plant were laid off. After the picketing stopped they returned to work and operation continued normally.

22. On January 11, 1960 the Board gave notice to Local 107 and Safeway that a hearing would take place on February 9, 1960 upon the charges which Safeway had filed under Sec. 10(k) of the Act, unless in the interim satisfactory evidence was submitted that the parties had adjusted the dispute or had agreed upon methods for its voluntary adjustment. This hearing was continued by agreement of the parties. So far as the record shows no disposition of the controversy has been made by the parties or by the Board.

23. Petitioner had reasonable cause to believe that the following facts are true:

(a) Local 107 or its agents have induced and encouraged individuals employed by Safeway, and by other persons engaged in commerce or industries affecting commerce, to refuse in the course of their employment to transport, handle and work on goods, articles, materials and commodities and to perform services, and have threatened, coerced and restrained Safeway, and other persons engaged in commerce or in industries affecting commerce;

(b) The purpose of such activities was to force or require Safeway to assign the work of driving its trucks between its Wilmington plant and its distribution centers in Landover, Maryland and Kearney, New Jersey to employees in Local 107 rather than to employees in Locals 639 and 660;

(c) When Safeway assigned such work to employees represented by Locals 639 and 660, no order or certification had been issued by the Board determining Local 107 to be the bargaining representative for employees performing such work;

(d) The acts and conduct of Local 107 and its agents set forth in sub-paragraphs (a) and (b) of Finding of Fact 23, occurring in connection with the operations of Safeway, and others, have a close, intimate and substantial relation to trade, traffic and commerce among the several states and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce;

(e) Unless injunctive relief is granted pending final adjudication of the Board with respect to the matter in controversy, the picketing and work stoppage which existed prior to the issuance of the temporary restraining order will continue with the result that the Wilmington plant of Safeway will be shut down, 165 to 175 employees will be thrown out of work, and interstate commerce will be obstructed and interfered with.

### Conclusions of Law

1. Under Sec. 10(l) this Court has jurisdiction of the parties and of the subject matter of this action, and is empowered to grant injunctive relief.

the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

2. Petitioner had reasonable cause to believe that:

(a) Locals 107, 639 and 660 were labor organizations within the meaning of Secs. 2(5), 8(b) and 10(*l*) of the Act.

(b) At the time when this action was begun and prior to the issuance of the restraining order on January 9, 1960, Local 107 and its agents were engaged in, and unless they are enjoined pending the final adjudication of the controversy by the Board, they will repeat and continue to engage in, activities in violation of Sec. 8(b) (4) (D) of the Act.

(c) Safeway was and is engaged in commerce within the meaning of Secs. 2(6)[5] and (7)[6] of the Act.

(d) It is just, proper and appropriate that, pending the final adjudication of the controversy by the Board, Local 107, its officers, representatives, agents, servants, employees, attorneys and all members and persons acting in concert or in participation with it or them be enjoined and restrained from the commission, continuation or repetition of the acts and conduct set forth in sub-paragraphs (a) and (b) of paragraph 23 of the Findings of Fact, and acts and conduct in furtherance or support thereof.

### Discussion

When a Sec. 8(b) (4) (A), (B) or (C) violation is charged and the granting of an injunction under Sec. 10(*l*) is otherwise just and proper, a definitive judicial determination that an unfair labor practice has occurred is not required. It is enough for the Court to find that the officer or regional attorney to whom the charge was referred had reasonable cause to believe that the charge was true. Schauffler v. Highway Truckdrivers & Helpers, etc., 3 Cir., 1956, 230 F.2d 7, 9; Shore, for and on Behalf of National Labor Relations Board v. Building & Construction Trades Council, etc., 3 Cir., 1949, 173 F.2d 678, 681, 8 A.L.R. 2d 731; Douds v. Local 50, Bakery & Confectionary Workers, etc., 2 Cir., 1955, 224 F.2d 49, 50; Douds v. Confectionary & Tobacco Jobbers Employees, etc., D.C. S.D.N.Y.1949, 85 F.Supp. 191, 193. The "reasonable cause to believe" language of Sec. 10(*l*) provides a statutory explanation for this standard of proof in a Sec. 8(b) (4) (A), (B) or (C) case.

Sec. 10(*l*), as it relates to a Sec. 8(b) (4) (D) charge, contains no "reasonable cause to believe" verbiage. The reason for this is because the procedure for determining an 8(b) (4) (D) charge is unique. Unlike a Sec. 8(b) (4) (A), (B) or (C) charge, which is determined by the Board under Sec. 10 (c)[7] after the filing of a Sec. 10(b)[8] complaint, a Sec. 8(b) (4) (D) charge is processed under Sec. 10(k). This provides for a special type of arbitration procedure under which the Board is required to determine the dispute out of which the alleged 8(b) (4) (D) violation has arisen, i. e., the validity of the assignment of the work to employees of one labor organization, trade, craft or class rather than to those of another. National Labor Relations Board v. United Ass'n of Journeymen & Apprentices, etc., 3 Cir., 1957, 242 F.2d 722. Nevertheless, before the Board may hear and determine the work assignment issue under Sec. 10(k), it must make a prelim-

---

5.  29 U.S.C.A. § 152(6):

    "(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

6.  29 U.S.C.A. § 152(7):

    "(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

7.  29 U.S.C.A. § 160(c).

8.  29 U.S.C.A. § 160(b).

inary determination that Sec. 8(b) (4) (D) has been violated. Herzog v. Parsons, 1950, 86 U.S.App.D.C. 198, 181 F. 2d 781, 784. This is substantially the same as the "reasonable cause to believe" responsibility imposed by Sec. 10(*l*) upon the officer or regional attorney when a Sec. 8(b) (4) (A), (B) or (C) charge is filed. The quantum of proof required for the granting of a Sec. 10(*l*) injunction against an 8(b) (4) (D) violation should therefore be no different than that required when a violation of 8(b) (4) (A), (B) or (C) is charged. This is the conclusion of the Courts which have considered the question. Douds v. International Longshoremen's Ass'n, etc., 2 Cir., 1957, 242 F.2d 808, 810; Alpert v. International Brotherhood of Electrical Workers, etc., D.C.D.Conn.1958, 163 F. Supp. 774, 777–778; Hull v. American Wire Weavers' Protective Ass'n, etc., D. C.N.D.Ohio E.D.1957, 159 F.Supp. 425, 426; Cf. Douds v. Wood, Wire & Metal Lathers International Ass'n, etc., 3 Cir., 1957, 245 F.2d 223, 225.

■ Because Sec. 10(k) obligates the Board to determine the propriety of the assignment of the work which is in controversy, the union argues that in the instant case injunctive relief can be granted only if there is reasonable cause to believe that the Board will decide that members of Locals 639 and 660 and not members of Local 107 are entitled to the work. This argument ignores the purpose of Sec. 10(*l*). When Congress authorized the granting of injunctive relief pending the determination of an 8(b) (4) (D) charge, it intended to provide a means whereby the public interest might be protected by the orderly and peaceful continuation of industrial activities pending dispositive Board action. Douds v. Wood, Wire & Metal Lathers International Ass'n, etc., supra, 245 F.2d at page 225. To hold that injunctive relief is not authorized unless it is first shown that the Board would probably uphold the work assignment against which the union is protesting would mean that in many instances work stoppages would continue while the Board was deliberating, and thus the purpose for which Sec. 10(*l*) was enacted would be defeated.

■ In a Sec. 10(*l*) proceeding it is not the duty of the Court to forecast how the Board will decide a work assignment dispute; it is to determine whether the petitioner had reasonable cause to believe that an unfair labor practice was taking place. Douds v. International Longshoremen's Ass'n, etc., 2 Cir., 1957, 242 F.2d 808, 810–811. It is unfair labor practices which Sec. 10(*l*) was designed to protect against. When these practices bring about a work stoppage the injury to the public is the same regardless of how the Board may ultimately decide the work assignment issue.

■■ In the present case there is no proof that a complaint has issued or is contemplated. Because of this, Local 107 contends that the filing of the petition was unauthorized. This argument fails to take into account the difference between the application of Sec. 10(*l*) to a Sec. 8(b) (4) (D) charge and its relationship to the other unfair labor practices with which Sec. 10(*l*) deals. In the case of the latter, Sec. 10(*l*) expressly states that a petition for an injunction may be filed only after the officer or regional attorney has concluded that a complaint should issue. Sec. 10(*l*) imposes no similar condition for petitioning for an injunction when an 8(b) (4) (D) charge has been filed. The reason for the distinction is plain. An 8(b) (4) (D) charge must be brought before the Board in a 10(k) proceeding and the hearing is not originated by a complaint. Hearings on other unfair labor practices specified in Sec. 10(*l*) are held by the Board under Sec. 10(c) after the issuance of a complaint under Sec. 10(b).[9]

9. A complaint may be issued by the Board under Sec. 10(b) based upon a Sec. 8(b) (4) (D) violation only if the union which is the loser in a Sec. 10(k) proceeding fails to comply with the determination of the Board. International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 1952, 342 U.S. 237,

The issuance of injunctions under 10(*l*) directed against unfair labor practices under Sec. 8(b) (4) (D) have been upheld despite the fact that, so far as the opinions reveal, no complaints had been issued by the Board or were in contemplation by it. Schauffler v. United Asso. of Journeymen & Apprentices, etc., 3 Cir., 1955, 218 F.2d 476; Douds v. Wood, Wire & Metal Lathers International Asso., etc., 3 Cir., 1957, 245 F.2d 223; Local 450, International Union of Operating Engineers, etc. v. Elliott, 5 Cir., 1958, 256 F.2d 630; But see Herzog v. Parsons, 1950, 86 U.S.App.D.C. 198, 181 F.2d 781, 786.

█ The picketing of Local 107 was against Safeway and not its customers or suppliers. Secondary activities of the latter kind, it is argued, are condemned by Sec. 8(b) (4) (D) and not primary picketing such as Local 107 was engaged in. Sec. 8(b) (4) (D) in terms makes no distinction between primary and secondary activities. The comprehensiveness of its language militates against reading such a distinction into it, particularly as the proviso clauses at the end of 8(b) (4) imposing limitations upon its operation contain no suggestion that primary action was intended to be excluded from its coverage. The impact of Sec. 8(b) (4) (D) on union activities of a primary kind has been recognized. Douds v. International Longshoremen's Asso., etc., 2 Cir., 1957, 242 F.2d 808; ILA No. 1351, etc. and Rothermel Bros., 108 N.L.R.B. 712 (1954); See, Local 450, International Union of Operating Engineers, etc., v. Elliott, 5 Cir., 1958, 256 F.2d 630, 635. In International Longshoremen's and Warehousemen's Union v. Juneau Spruce Corp., 1952, 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 the Court sustained a monetary judgment in favor of an employer against a union for damages resulting from primary picketing. The action was brought under Sec. 303 (a) (4)[10] of the Act. While the question whether primary picketing was interdicted by Sec. 303(a) (4) was not discussed, the decision necessarily stands for the proposition that Sec. 303(a) (4) is not limited to secondary picketing. Since the conduct condemned by Sec. 303(a) (4) was substantially identical to that proscribed by Sec. 8(b) (4) (D) (International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., supra, 342 U.S. at page 243, 72 S.Ct. at page 239) the application of Sec. 8(b) (4) (D) to primary picketing has, in effect, been settled.

244, 72 S.Ct. 235, 96 L.Ed. 275; N.L.R.B. v. United Asso. of Journeymen & Apprentices, etc., 3 Cir., 1957, 242 F.2d 722, 724; In the matter of International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 82 N.L.R.B. 650, 656 (1959); Cf. N.L.R.B. v. Local Union No. 9, etc., 4 Cir., 1958, 255 F. 2d 649, 652.

10. 29 U.S.C.A. § 187(a) (4) (1956):
"(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is— * * *
"(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work. * * * *"

Subsequent to the decision in International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., supra, this section was amended by Pub. L. 86–257, Title III, 303(a), 73 Stat. 519, 29 U.S.C.A. § 187(a) (1959). The section now reads (29 U.S.C.A. § 187(a)):
"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b) (4) of this title. As amended Sept. 14, 1959, Pub. L. 86–257, Title VII § 704(e), 73 Stat. 545."

A finding that Local 107 and its agents induced or encouraged truckdrivers not to transport materials or commodities to the Safeway plant or to perform services, would not, as the union asserts, be at odds with N. L. R. B. v. International Rice Milling Co., 1951, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277 and Cuneo v. Local 472, etc., D.C.D.N.J.1959, 175 F. Supp. 131. These cases held that when a union induces or encourages individual employees not to cross a picket line its activities are not designed to induce "concerted" action by the employees. Both cases arose under Sec. 8(b) (4) at a time when it defined an unfair labor practice as inducing or encouraging specified "concerted" activities. The statutory requirement of "concerted" action was eliminated by an amendment to Sec. 8(b) (4) which became effective on September 14, 1959. Pub.L. 86–257, Title VII, § 704(a), 73 Stat. 519 (1959). The purpose of the amendment was to close the loophole which International Rice Milling Co., supra, had revealed. Sen.Rep. No. 187, U.S.Code Congressional & Administrative News, 86 Cong., 1st Sess.1959, p. 596.

Finally, Local 107 urges that Sec. 8(b) (4) (D) was directed against jurisdictional disputes and that no jurisdictional dispute is here involved because no disagreement exists between the unions. The only controversy, it is said, is between Local 107 and Safeway, and relates to the right of Safeway to discharge its employees who are members of Local 107, to unilaterally terminate the collective bargaining relationship between Safeway and Local 107, and to change its work methods. It is unnecessary to decide with finality just what a jurisdictional dispute is, or to determine with finality whether Sec. 8(b) (4) (D) was intended to reach disputes in addition to those which are jurisdictional, however the latter may be defined. The responsibility of the Court in this proceeding is to decide only whether petitioner had reasonable cause to believe that Sec. 8(b) (4) (D) was being violated.

At least one of the objectives of the picketing was to compel Safeway to assign the driving of its trucks to members of Local 107 with the consequence of depriving members of Locals 639 and 660 of their jobs. The statements made by Crawford on December 31, and by Crawford and Cohen on January 4 reasonably support this conclusion (Findings of Fact 10, 11). Picketing, so motivated, has an objective which seemingly runs afoul of the plain terms of sub-paragraph (D) of Sec. 8(b) (4). One illegal objective is enough to bring Sec. 8(b) (4) into play. N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 688–689, 71 S.Ct. 943, 95 L.Ed. 1284. The fact that an employer is not simply a neutral victim in a contest between unions, but is actively interested in having work assigned to one union rather than to another, does not make Sec. 8(b) (4) (D) inoperative. Compare International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 9 Cir., 1951, 189 F.2d 177, 188; affirmed 1952, 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275. Whatever the ultimate decision may be as to the purpose of the union's picketing, the petitioner had reasonable cause to believe that at least one purpose was to force Safeway to give the truckdriving jobs to members of Local 107 rather than to members of Locals 639 and 660.

Neither Cuneo v. Local 472, etc., D.C. D.N.J.1959, 175 F.Supp. 131; Hull v. American Wire Weavers Protective Asso., D.C.N.D.Ohio E.D.1957, 159 F. Supp. 425, requires a different conclusion. In the former case the picketing had as its objective the unionization of non-union labor. The Court took pains to distinguish Local 450 etc. v. Elliott, 5 Cir., 1958, 256 F.2d 630, which held that Sec. 8(b) (4) (D) had been violated, by pointing out that in Local 450 one union had sought the assignment to its members of work being performed by members of another union. This, of course, is the situation which seemingly exists in the case at bar. In the American Wire Weavers case the picketing was

to compel the employer to assign to union members work which was being performed by persons who were not members of a labor organization, trade, craft or class within the meaning of Sec. 8(b) (4) (D). For this reason, the Court held, the controversy was not one at which Sec. 8(b) (4) (D) was aimed.

The petitioner had reasonable cause to believe that Sec. 8(b) (4) (D) was being violated. If the picketing is permitted to continue the operations of the Wilmington plant will be brought to a standstill, and 165 to 175 employees will be put out of work merely because Local 107 is claiming work for 3 of its members which is being performed by members of other unions. In these circumstances it is just, proper and appropriate that an injunction issue. The threat of a work stoppage because of activities denounced by Sec. 8(b) (4) (D) is reasonable cause to enjoin such activities. Douds v. Wood, Wire & Metal Lathers International Asso., etc., 3 Cir., 1957, 245 F.2d 223, 225.